**MONSANTO CHEMICAL COMPANY,**
Libelant-Appellee,

v.

**NO. 3 BULL TOWING COMPANY, THE BULL DURHAM, and BARGE NBC 965, Respondents-Appellants.**

**MONSANTO CHEMICAL COMPANY,**
Libelant-Cross-Appellant,

v.

**NO. 3 BULL TOWING COMPANY, The Bull Durham, and Barge NBC 965, Respondents-Cross-Appellees.**

Nos. 15057, 15058.

United States Court of Appeals
Sixth Circuit.
Dec. 18, 1963.

Charles Kohlmeyer, Jr., New Orleans, La., and John B. Mack, Memphis, Tenn., Clarence Clifton, Memphis, Tenn., on the brief; Clifton, Mack & Kirkpatrick, Memphis, Tenn., Lemle & Kelleher, New Orleans, La., of counsel for Monsanto Chemical Co.

W. Emmett Marston, Memphis, Tenn., Martin, Tate & Morrow, Memphis, Tenn., of counsel for No. 3 Bull Towing Co., and others.

Before WEICK and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal in an admiralty case in which the Monsanto Chemical Company,[1] hereinafter called plaintiff, sought damages from No. 3 Bull Towing Company, the Bull Durham, and Barge NBC 965, hereinafter called the defendants. The District Court found that the barge was unseaworthy because of a faulty valve, and that plaintiff's damages were directly and proximately caused by such unseaworthy condition.

The damages resulted from the contamination of ethyl gasoline by kerosene during the unloading of Barge NBC 965, at Memphis, Tennessee, on April 26, 1957. The barge in question has a ten-inch pipe, or header line, running longitudinally along its bottom, and is connected with each of ten large cargo tanks, or compartments. At the bottom of each of the tanks, there is a valve, with the stem of such valve running through the top of the tank and adjacent deck, above which there is a wheel that controls the opening and closing of the valve. When the valve of a tank is open, the petroleum product in the tank runs into the ten-inch pipe, or header line. To discharge the cargo, this header line is connected to a hose from the shore or dock, and the oil or gasoline, or other petroleum product, is pumped through the hose to tank cars, or storage tanks, or pipelines, on shore. In this case, while the valves on tanks 1 and 2, port and starboard, were open, and the ethyl gasoline from those tanks was running into the header line and being discharged through the hose to storage facilities on shore, it was discovered that the valve of No. 5 starboard tank, containing kerosene, was open, and that kerosene was leaking into the header line and contaminating the ethyl gasoline as it was being discharged to the shore.

The way in which it was first discovered that the kerosene was contaminating the ethyl gasoline was when Wiley Warren, a member of the crew of the Bull Durham tow, in charge of the pumping engine, noticed that, a couple of hours after the gasoline commenced to be discharged, the barge was listing. He told the dock man and shut off the pump under orders from plaintiff's representatives. They then looked into the No. 5 starboard tank of kerosene and found that the kerosene was down some three feet, which represented a discharge of approximately 14,000 gallons of kerosene which had been pumped out along with approximately 125,000 gallons of ethyl gasoline. It was then discovered that the valve of the No. 5 starboard kerosene tank was open—or not completely closed. One of the members of plaintiff's crew and one of the members of defendants' crew then prepared to close the No. 5 starboard valve by using a steel bar inserted in the wheel, but Captain Bull of the tug ordered them not to use the bar for fear of breaking the stem of the valve. At that time the regular mate of the tug, Marion Warren, came aboard, asked what was wrong, and succeeded in completely closing the valve.

The testimony is somewhat confusing as to the checking of the valves of the various tanks or compartments, before the unloading operations commenced. Edgar Miles, the superintendent of plaintiff's Memphis terminal, testified that before the unloading operation, he went aboard the barge to ascertain, among

1. The Lion Oil Company mentioned throughout the case is a subsidiary of the Monsanto Chemical Company.

other matters, that all the valves were in a closed position; that, in doing so, he was working in cooperation with Wiley Warren, a member of the crew of defendant Bull Durham's tow; that Miles started at the port side, and Wiley Warren at the starboard side; that they proceeded walking side by side down the barge toward the stern; that when they came to the No. 5 compartments, in which the kerosene was being carried, they found that both port and starboard valves were open; that Miles closed the No. 5 port valve, and Wiley Warren went through the motion of closing the starboard valve, and appeared to close it at that time. After all the valves were apparently closed, Robert Wages, plaintiff's senior terminal operator, came along behind Wiley Warren and checked all the valves by putting some pressure on the wheels in the closing position. He testified that the valves "seemed to *seat* properly" and appeared to be tight. The No. 5 starboard valve, as far as he could determine, was working properly and appeared to be closed, with the normal pressure he put on it. Captain Cobb, of the tow boat, testified that he checked the valves with Mr. Miles at the latter's request. He checked the No. 5 starboard valve without using any extra force, "Normally, like I normally close the valve, like it should be closed." He testified that he thought what he did was sufficient, but that it turned out that apparently it was not sufficient to close the valve.

When it was discovered that the kerosene was getting low in the No. 5 starboard tank, and was leaking into the header line, contaminating the ethyl gasoline that was being discharged, Marion Warren, the mate of the tow boat, as has been said, happened to come aboard the barge. When he was told about the situation, he proceeded to force the No. 5 starboard valve completely closed by throwing all his strength into turning the wheel to the closed position. He testified:

"Q. Did you use any instrument or bar or anything to assist you? A. No, just my hands, with quite a bit of force, in fact, all I was able to do.

"Q. By jerking? A. Yes, sir, by jerking I did turn it down some. * * * I would say between a quarter and a half a turn."

Afterward, and subsequent to a return trip to Helena, Arkansas, the barge was loaded with petroleum products which it then carried to Chicago. Both the loading at Helena and the unloading at Chicago were uneventful, and no difficulty was found with the valve in question. Upon completion of the Chicago trip, the barge was taken to defendants' dock at its headquarters in Joliet, Illinois. Following its arrival there the port engineer made an inspection of the No. 5 starboard valve of said barge. In doing this, the valve and valve stem were removed, and there was revealed therein a cotton cord of the type used by petroleum inspectors. The cord was tied to the neck of a broken sample bottle and a metal nut. The cord, which was approximately fifteen feet long, had become entwined around and in the threads of the valve. It was an internal type valve, and the cord could not be seen by visual inspection either from the hatch on the deck or by examination from within the compartment. It was removed from the valve threads and the valve was replaced without any repairs being required. Prior to removal of the cord, it could not be determined by turning the valve wheel whether there was a cord therein.

The Trial Court found that due to the malfunctioning of the valve, brought about by the cord being entwined around and in the threads of the valve, the barge was unseaworthy, and that its unseaworthy condition was the direct and proximate cause of the damages resulting to plaintiff company from the contamination of the kerosene with the ethyl gasoline.

■ It is clear that the valve with the cotton cord in its threads did not operate properly. That is seen from the fact that it was leaking kerosene into the other petroleum products until Marion Warren, the mate of the tug, came aboard

and succeeded in forcing it closed by jerking the valve wheel with all the force of which he was capable. The valve did not properly seat with the ordinary force with which valves are closed. The barge was unseaworthy. With the cord intertwined in the threads of the valve, so that it would leak kerosene while the gasoline from other compartments was being pumped out through the shore hose, the barge was not reasonably fit for its intended use. The duty to furnish a seaworthy vessel is absolute. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.

After the gasoline and kerosene were contaminated, plaintiff company sold the contaminated product at the best possible price to the Triangle Refineries at Houston, Texas, at a loss, and this loss with expenses of transportation to Memphis, and from Memphis to Houston, constitute the damages which plaintiff seeks to recover.

A difficult problem in the case arises out of the proof of damages.

■ No question is raised but what the measure of damages is the difference between the wholesale market of the uncontaminated gasoline and kerosene, and the highest price that could be, and was, received by plaintiff, when it sold the contaminated products at the best available market value. Counsel for defendants, in a colloquy stated: "I understand the market value is the rule, certainly. I am trying to find out whether or not this is the market value."

There are three conclusions drawn by one or the other party as to the damages in this case, or by the Trial Court in its findings:

(1) That the market value of the ethyl gasoline, which was contaminated, was never legally proved by the Monsanto Chemical Company. This was the contention of defendants.

(2) That the market value of the ethyl gasoline, if it had not been contaminated when sold at Houston, would be 15.929 cents per gallon. This was the market value found by the Trial Court. Both parties disagree with this finding.

(3) That the wholesale market value of the ethyl gasoline at Memphis on April 26, 1957, amounted to 16.25 cents per gallon, as contended by the Monsanto Chemical Company.[2]

■ We have come to the conclusion that the evidence supports the findings of fact of the Trial Court, that the value of the ethyl gasoline, if it had not been contaminated at the time it was sold at Houston, would amount to 15.929 cents per gallon; that while the Trial Court could have found that the value of the gasoline at Memphis on April 26, 1957, was 16.25 cents per gallon, nevertheless, it was for the Court to choose among the conflicting proofs of damage; and that its judgment should be affirmed upon its findings of fact and conclusions of law.

In his testimony, Mr. Garrison referred to letters, recapitulations and records of the plaintiff company. The records were kept at El Dorado in the department of which he had charge, and which were under his direct supervision and control, although Mr. Garrison himself had not been associated with plaintiff company until three years after the damages from the contamination occurred. Nevertheless, among the actual records of the company which were placed in Mr. Garrison's hands during his direct examination, was the barge loading order addressed to plaintiff Monsanto Company in Memphis, for the barge, "loaded with [the] product which was [later] sold to Triangle Refinery" as well as the invoice from plaintiff Monsanto Company to Triangle Refineries, Inc. where the contaminated oil was eventually sold. Mr. Garrison testified that he was familiar with the pipeline tariff from the plaintiff's refinery at El Dorado, Arkansas, to its terminal at Helena, Arkansas—which

---

2. There is no difficulty with regard to the contaminated kerosene, as that was sold at a price in excess of its original value.

was ten cents a barrel—and this figure was the same as shown by the records of plaintiff company, which also was the published and accepted pipeline tariff; that the towing cost from Helena to Memphis, to which he testified, was calculated from defendants' own invoice for the transportation of the oil and gasoline; that the tax on towing from Helena to Memphis was a given amount, calculated from defendant company's own invoice for towing charges; that the Tennessee state tax upon the contaminated petroleum product exported from Tennessee to Houston, where it was eventually sold, was a given amount. Mr. Garrison was then asked:

"Q. Unit sales price, fifteen-five, that is 15.5 cents, was that the established price in April, 1957, for gasoline, 99 premium gasoline at El Dorado, Arkansas?

A. Yes, sir."

While Mr. Garrison had papers before him while testifying, that circumstance alone would not vitiate his testimony. As to the pipeline tariff of ten cents a barrel, he knew what this tariff was: it was the published tariff, and was the same as shown by the record in his hand. As to the towing cost from Helena to Memphis, this was taken by Mr. Garrison directly from the defendants' own invoice, and Mr. Garrison's testimony on this point was entirely valid, as the data was supplied by the opposing party, and was not disputed. As to the tax on towing from Helena to Memphis, that, too, was supplied by defendants, and there, likewise, could be no opposition to Mr. Garrison's testimony on this point.

As to the unit sales price of 15.5 cents per gallon at the refinery at El Dorado, there is much confusion and question as to whether the witness Garrison was testifying from his own memory, refreshed by records of the company, or whether he was testifying from records which themselves were inadmissible. Mr. Garrison, however, during his direct examination, testified from a price schedule, dated April 15, 1957—the month in which the

damages for contamination were sustained—and declared that the retail price of ethyl gasoline in Memphis at that time was 16.25 cents per gallon. On cross-examination, Mr. Garrison was asked what the price schedule was, from which he was testifying. He replied: "This is a statement, a company record statement for the Lion Oil Company price schedule, Lion Oil schedule number 2. It is a photostatic copy from our books." He was then asked:

"Q. Are you testifying from your personal knowledge or from the company records?

"A. Company record."

This reply led to considerable objection, on the ground that the witness was not testifying from his personal knowledge, the Court stating, however, that the witness could refresh his memory from the record. The witness during the foregoing colloquy stated: "I can testify from other records to the same information as I have been in the petroleum business. * * * There are established records that would indicate that the same prices which the Lion Company stated, or whoever was in business here—"

"The Court: He has made it clear enough, I believe, * * *. He says that was definitely the market price on the date in question, and that he was using these records for the purpose of refreshing his memory on it. * * * Is that what you told us?

"A. As I understand the question, Your Honor—in making the testimony as I did, which I have actual recollection of the state market price as to the time of April '57—the paper I am referring to, to refresh my memory, happened to be Lion Oil. I will be happy to read out of the Almanac actually, which is a recap of prices applicable to this area, *which is the same*." (Emphasis supplied.)

The Almanac in question was afterward used by counsel for defendants to ascertain gasoline prices during the cru-

cial period in this case. Defendants' counsel pursued the foregoing subject:

"Q. So, in what you already quoted from this price schedule, you are using that of course to refresh your recollection, is that correct?

"A. Yes, sir.

"Q. Then it was not you just testifying from what the price was at that time, the record furnished you by Lion Oil Company, is that correct?

"A. I testified to prices. I did not think I was testifying to the validity of this statement * * *. I was just quoting prices to my knowledge, refreshing my memory from this sheet of paper.

"Q. But you were testifying from that price schedule there, is that correct?

"A. Yes, sir. *I was making reference to those prices.* (Emphasis supplied.)

"Mr. Marston: If the Court please, I am going to object to this witness testifying from the records which he did not make, and was made some years ago by Lion Oil Company.

"The Court: Whether he made it or not, it is immaterial, if that serves to refresh his recollection about the price on a given date."

■ Much of the objection to Mr. Garrison's testimony could have been cured if it had been presented in a slightly different form. There appears no reason why the Lion Oil Company price schedule could not have been introduced in evidence as a record of the company. Opposing counsel did not object to the schedule on the ground that it was not one of the regular company records kept during April, 1957. The objection was that Mr. Garrison was testifying from such record. Ordinarily, it would seem that plaintiff's counsel would introduce the schedule into evidence, as a record of the company, or that opposing counsel

would insist upon its being offered in evidence before any testimony was given with regard to it, reserving, of course, any proper objection to the admission in evidence of the document after they had an opportunity to examine it, and question the witness about it. The objections to Mr. Garrison's testimony were not based on the ground that he was testifying from records not in evidence, but that he was testifying from records. Moreover, objections that Mr. Garrison was testifying from records which he did not make, and which had been made in prior years by his company, were not sufficiently definite. The objections which were made indicated that the records were company records made in the ordinary course of business, but that because Mr. Garrison did not himself make the records in question, he could not testify regarding them. If they were company records kept in the ordinary course of business, they could have been introduced in evidence and Mr. Garrison, being then in charge, could have testified with regard to the entries, whether he made them or not.

To sustain the judgment of the District Court, there is only one issue in the case: Was there substantial evidence to prove that the "unit sales price" of the premium gasoline at El Dorado, Arkansas, was 15.5 cents per gallon in April, 1957.

As already indicated, we are of the view that this unit sales price was proved by substantial evidence; and this evidence appears in the cross-examination of Mr. Garrison, the plaintiff's witness.

On cross-examination, Mr. Garrison was asked by counsel for defendants to take Platt's Oilgram, apparently an acknowledged price book in the gas and oil industry, in order to testify as to prices of gasoline.

Counsel for defendants asked:

"Q. All I want you to testify is your knowledge of the regular as of today or as of 1957. Then if you take your tank wagon price as shown for regular gasoline, and of premi-

um grade, isn't there some discount to the jobber?

"A. Yes, sir, yes, sir.

"Q. And wouldn't you take something off of this seventeen figure?

"A. From regular grade gasoline you take three and one quarter cents a gallon off, and for premium you take three and three quarters cents per gallon off.

"Q. All right, then, based on this Oilgram, using then those figures, excluding taxes, state and published taxes, would you compute—well, dealer tank wagon prices in Memphis, Tennessee, in 1957?

"A. On premium grade gasoline?

"Mr. Marston (counsel for defendants): Yes, sir.

"A. Yes. Taking the dealer tank wagon that is published at 17.1, I add three and a half cents a gallon to get the dealer tank wagon price on premium gasoline. I deduct from that three and three quarter cents allowance for the jobber, and again deduct .006 for the inspection fee.

"Q. *Well, what does that give you?*

"A. *16.25 cents per gallon.*

"Q. *And that would be the price at which it would be sold from the tank here in Memphis, is that correct?*

"A. *Yes, sir.*

"Q. Now, I believe that is with truck carloads, and so forth?

"A. Tank car, trucks, yes, sir.

"Q. The figure you have given us is not the dealer tank wagon price, the refinery's price, is that correct?

"A. Which figure are you referring to?

"Q. The figure you have used, 15.9 or 15.5.

"A. *15.5, as we have stated, is the wholesale price for this gallon of gas effective at El Dorado, Arkansas, at this time, to which you also add*

*cost involved of transporting it to Memphis."* (Emphasis supplied.)

The above answer is the evidence upon which the Trial Court must have based its findings. It constituted valid evidence of the fact. It was the same as though counsel on cross-examination of the adverse witness had asked: "What was the value of ethyl gasoline at El Dorado on April 26, 1957?" and the witness had answered: "15.5 cents per gallon." Counsel, who brought out this testimony on cross-examination, never disputed it or contradicted it by other proofs. It was sufficient evidence to enable the Court to base a finding thereon.

When, to the figure of 15.5 cents per gallon are added the costs of transportation to Memphis and taxes, which are fully set forth and shown by credible evidence, the value of the gasoline per gallon at Memphis in April, 1957, was proved to be 15.929 cents per gallon as the Trial Court found. This was considerably less than the value per gallon, contended by plaintiff, which was 16.25 cents per gallon.

It may be observed that during Mr. Garrison's cross-examination he stated at a different point in his testimony that the value of the ethyl gasoline at Memphis in April, 1957, was 16.25 cents per gallon. He further stated that at Memphis, on April 26, 1957, the regular grade gasoline at dealer tank wagon price would be 17.1 cents per gallon, with deduction for allowance to jobbers and inspection fee, plus all applicable taxes. He testified:

"Q. All right, then to get the premium how much would you add to that?

"A. Three and a half cents.

"Q. Three and a half cents?

"A. Yes, sir.

"Q. *In other words, to figure premium would be three and a half cents greater than the regular?*

"A. At the retail price at the pump it is four cents higher, but normal sales to the wholesale jobber actually you allow them a half a cent a gallon.

"Q. *This was true in 1957?*

"A. *Between, say—oh, yes, sir.*

"Q. *For premium above regular?*

"A. *No, sir.*

"Q. Has it ever been that to your knowledge?

"A. *Specifically at the time has it ever been two cents a gallon differential between premium and regular?*

"Q. At any time, yes, sir. You said—in other words, *what is that differential between the premium and regular?*

"Mr. Clifton: Back in '57.

"A. *In '57.*

"Mr. Marston: Yes, sir.

"A. *At the time, no it was not three and a half cents.*"

The foregoing testimony is most confusing, as it appears therefrom that the wholesale price of ethyl gasoline on April 26, 1957, at Memphis, might be three and one half cents—or two cents—per gallon more than the regular gasoline. If, of course, the differential between premium, or ethyl gasoline, and regular gasoline was three and one half cents a gallon, the dealer tank wagon price would be 16.25 cents per gallon, as plaintiff claims. If the differential were two cents a gallon, as might also be inferred from Mr. Garrison's testimony, the dealer tank wagon price was 14.75 cents per gallon or less. It is possible to interpret the foregoing testimony as proof that there was a differential at the time and place in question of three and one half cents per gallon, or of two cents per gallon "for premium over regular."

Nevertheless, there was in the evidence the clear testimony of Mr. Garrison, brought out on cross-examination by counsel for the opposing party, that 15.5 cents per gallon was the wholesale price of the ethyl gasoline effective at El Dorado, Arkansas, at the time in question; and that the conceded additions to this price, consisting of towage charges and taxes, raised the value of the gasoline delivered to Memphis, and subsequent towage and export tax, to 15.929 cents per gallon, as was testified to by Mr. Garrison. As to the figure of 16.25 cents per gallon, which was also testified to by Mr. Garrison, as the wholesale price of the ethyl gasoline in Memphis at the time in question, there was uncertainty and contradiction. The value of 15.929 cents per gallon was the figure the Court finally adopted; and we are of the view that the Court's findings were amply sustained by the evidence.

In spite of the numerous observations of the Trial Court and plaintiff's counsel during the course of the case that Mr. Garrison was entitled to refresh his memory from the records, it seems that the Trial Court in its ultimate conclusion arrived at the view that Mr. Garrison had not been able to refresh his memory from the records and that the only evidence on which to base a finding of the value of the contaminated gasoline consisted of the statements of Mr. Garrison on cross-examination in reply to the questions of opposing counsel, and we need not consider the legal propositions advanced on the question of the refreshing of the memory of a witness, by resort to records. The evidence of these statements that the wholesale price of the gasoline in question effective at El Dorado at the time in question was 15.5 cents per gallon was sufficient to enable the Court to adopt this figure as the basis of value of the gasoline, in its findings.

The Court took the testimony of Mr. Garrison as to the wholesale value of the ethyl gasoline at plaintiff's refinery at El Dorado, Arkansas, plus all expenses of getting it from the refinery to Memphis and then to Houston, where it was sold at a loss of .04129 cents per gallon. The Court found that the value of this gasoline was 15.929 cents per gallon, which included the unit sales price of the product at 15.5004 cents; the pipeline tariff, El Dorado to Helena; the towing cost, Helena to Memphis; the transportation tax, and the export tax; that the gasoline was sold to Triangle Refineries, Inc., at a unit price of 11.8 cents per gallon,

resulting in a loss per gallon of .04129 cents for a total loss of $19,120.99.

The Court further found that, in addition to the gasoline, the 14,000 gallons of kerosene, which were mixed with the gasoline, were disposed of by Lion Oil to the Triangle Refineries; that the value of this product as of the time of the mixing was .11693 cents per gallon, which included the unit sales price of the product; the pipeline tariff, El Dorado to Helena; the towing cost, Helena to Memphis; the transportation tax-towing, and the export tax; that the kerosene was sold at the unit price of 11.8 cents per gallon, resulting in a gain to Lion of .00107 cents per gallon, or a total gain of $14.98; and that the deduction of this gain from the aforementioned loss resulted in a net loss to Lion Oil of $19,106.01.

In McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, the Court stated: "In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure." To the same effect, see also the recent opinion of this Court in Federal Insurance Company v. S. S. Royalton, 6 Cir., 312 F.2d 671.

We find no grounds for concluding that the judgment of the Trial Court was clearly erroneous.

The findings of the Trial Court as to the amount of gasoline that was contaminated, and the amount thereof for which defendants were liable in damages, were supported by the evidence.

 The Trial Court allowed plaintiff interest from the date of the filing of its action. Suit was not filed until two and a half years after the loss. As heretofore remarked, the proofs in the case were not thoroughly clear. It is evident that the Court acted on a discretionary basis. Allowance of interest in admiralty is discretionary with the Court; and we cannot say that its allowance of interest from the date of the filing of the suit, but not from the date of the loss in this case, was an abuse of its discretion.

In accordance with the foregoing, the judgments of the District Court are affirmed.