**COMMERCIAL TRANSPORT CORPORATION, Libelant-Appellant,**

v.

**MARTIN OIL SERVICE, INC. and Petroleum Sales & Construction Company, Respondents-Appellees.**

**No. 15546.**

United States Court of Appeals
Seventh Circuit.

Jan. 4, 1967.

Edward B. Hayes, William K. Johnson, Chicago, Ill., for libelant-appellant. Lord, Bissell & Brook, Chicago, Ill., of counsel.

Stuart B. Bradley of Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for respondents-appellees.

Before SCHNACKENBERG, KNOCH and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This is an admiralty proceeding brought by libelant to recover for damage to two of its gasoline tank barges sustained during a fire at respondent's [1] dock on the Sag Canal near Blue Island, Illinois. Respondent filed a cross-libel for damages to its dock and other property. The questions before us are whether libelant or respondent is entitled to any damages, and, if so, the proper measure of damages.

In early December 1957, BA 2003 and BA 2014 were loaded with gasoline in Houston, Texas. These barges were owned by libelant Commercial Transport Corporation ("Commercial"), a Delaware corporation with its principal office and place of business in Texas. Both were rather old steel barges and were pitted and pinholed, having been operated in the brackish waters of the Gulf of Mexico where barges deteriorate rapidly. Before leaving Houston, before and after being loaded with gasoline, the barges were checked by gauging (or measuring) their compartments for their water content. No measurable amount of water was then present.

On December 8, 1957, the two barges were towed by Commercial from Houston, arriving on Peoria Lake, Illinois, on December 21, 1957. At that time, the barges were delivered to Commercial's towboat *Davy Crockett*, whose crew discovered over a foot of water at the bottom of the No. 3 starboard tank of BA 2003. This meant that there was a hole in the hull of the barge that permitted the water to enter. As the District Court found, the damage to this barge had occurred between Houston and Peoria Lake. Later, it was discovered that the hole in the barge was 35 feet long and up to two inches wide, and about 12 inches above the keel of the barge. With this condition, a "water seal" had formed, with the water inside tank No. 3 under the gasoline cargo high enough to cover the hull hole, preventing further leaking of gasoline therefrom.

On the same day that these barges were delivered to the *Davy Crockett*, the presence of the excess water in tank No. 3 of BA 2003 was recorded in that towboat's log. Although Coast Guard regulations require a carrier to report serious damages to tank barges,[2] no such report was made to the Coast Guard. There are five locks between Peoria and the destination dock of respondent Martin Oil Service, Inc. ("Martin"), which is an Illinois corporation with its principal office and place of business in Illinois. Barge 2003 would not have been permitted to proceed through those locks without transferring its cargo to other compartments or to another barge if its unseaworthy condition had been reported to the authorities.

1. Another respondent, Petroleum Sales & Construction Co., has been dropped from the case because respondent Martin Oil Service, Inc. has assumed its responsibility.

2. See 46 CFR § 35.15–1. These regulations were issued pursuant to 46 U.S.C. § 391a(2) and have the force of law (46 U.S.C. § 375). Violators are subject to fine or imprisonment or both (46 U.S.C. § 391a(7)).

Near Joliet, Illinois, the two barges were delivered to the towboat *Spencer*, which was supplied by Commercial to deliver the barges to Martin. At 1:30 A.M. on December 24, Commercial notified Martin to expect the barges. The *Spencer* delivered the barges to Martin's dock near Blue Island, Illinois, at 2:30 A.M. that same morning, without affording Martin any notice of the unseaworthiness of barge 2003. The *Spencer* departed before Martin discovered that condition. Before its departure, the *Spencer* took none of the precautions required by the Coast Guard regulations, such as insuring that a qualified officer or licensed tankerman was on duty during the transfer of the gasoline from the damaged barge.[3]

Between 3:00 and 4:00 A.M., one of Martin's employees, Rex Lantrip, gauged barge 2014 and then barge 2003. The gauging was done with a graduated measuring tape with a weight, or "bob", on the end of it. During the gauging process, Lantrip discovered that tank No. 3 of barge 2003 contained 13½ inches of water, showing that the tank had a hole below the water line of the barge. At that time, this tank was oozing traces of gasoline, occasionally bubbling into the Sag Canal. Lantrip notified another Martin employee, Benedict Opyt, of the condition of tank No. 3. In the unexplained absence of his foreman, Opyt was in charge of unloading these barges. He had been employed as an assistant tankerman for four years, not receiving his license as a tankerman until April 1958. His foreman, Mike Wawczak, was a licensed tankerman and was normally in charge of the barge unloading crew. Upon learning of the leak in tank No. 3, Opyt telephoned Wawczak at his home. Wawczak agreed that the best unloading procedure would be to lighten barge 2003 by first pumping all its tanks except tank No. 3 and then pumping that tank. This was a common procedure for unloading

"leakers" such as this barge. Besides notifying Opyt of the excess water in tank No. 3, Lantrip reported it to Martin's Secretary by telephone, and that official authorized the unloading of the two barges.

According to uncontroverted testimony of an expert witness, there was no need to unload these barges immediately upon arrival, for the gas leakage was minimal at that time. However, at 4:25 A.M., Martin began to pump gasoline out of all the tanks of barge 2014. Except for damaged tank No. 3 the pumping of barge 2003 commenced at 4:35 A.M. Before any unloading commenced, Opyt had noticed the bubbling of gasoline from barge 2003's tank No. 3 into the Sag Canal. During the unloading, Opyt checked the depth of the water in starboard tank No. 3 every 15 or 20 minutes. At 6:45 A.M., only four or five inches of water were left in tank No. 3, the barge had risen one foot, and Opyt then looked over the side of the vessel and noticed that this tank was leaking much more gasoline than previously. Despite the presence of a great quantity of gasoline on the canal waters by then, Martin did not call the Coast Guard or the nearby Blue Island fire department. However, at 6:45 A.M., Opyt started pumping tank No. 3 and stopped pumping the other tanks of barge 2003.[4] This pumping was at maximum speed and was done in conjunction with a second telephone conversation with Opyt's supervisor, foreman Mike Wawczak, at his home. Opyt's call woke Wawczak and was made when Opyt observed all the gasoline flowing from tank No. 3 at 6:45 A.M. It is Commercial's position that Martin should have started pumping tank No. 3 as soon as the water level of that tank had dropped from 13½ inches to 12 inches, thereby breaking the "water seal". This could have been observed by a careful watch of the amount of gasoline leaking from the barge into

---

3. See 46 CFR § 35.35–1, § 35.35–20, and § 35.35–75. See also Note 2, supra.

4. The District Court's reference to the commencement of pumping at 6:45 A.M.

obviously referred to the pumping of tank No. 3.

the Sag Canal, but insofar as the record discloses, there was no observance of the leaking of gasoline from tank No. 3 after Opyt's first observation at 4:35 A.M. until his second observation at 6:45 A.M.

Between 6:30 A.M. and 7:00 A.M., the towboat *F. B. Payne*, with two barges in tow ahead of it, sighted Martin's dock. Soon thereafter, the *F. B. Payne* and its tow passed the two barges at Martin's dock at "dead slow speed". As the *F. B. Payne* passed these barges, there was a sudden fire on the water, consisting of burning gasoline at the head of barge 2003. The towboat proceeded to South Chicago, although the fire spread completely across the canal and along both sides of the tow. The flames were then 8 to 10 feet above the water, but after the tow cleared the fire, the flames rose 500 to 600 feet.

The fire, of undetermined origin, occurred at 7:15 A.M. while tank No. 3 was still being pumped. By then, at least 6,485 gallons of gasoline had leaked onto the surface of the Sag Canal. The fire spread to Martin's pumphouse, where the first explosion occurred. Soon thereafter, barge 2003 exploded, later partially sinking. The fire lasted for several hours. As a result, barge 2003 was severely damaged and the companion barge was damaged to a lesser degree. Substantial damage was also inflicted upon Martin's dock and other property. Martin had taken no precautions to prevent this fire. After it broke out, Martin called the fire department of nearby Blue Island. The fire chief of that community had unsuccessfully previously recommended that Martin install certain fire preventive measures. He summoned a Chicago fireboat to help combat the holocaust.

Prior to this accident, Martin had received other "leakers", although most of them were not leaking as badly as barge 2003. Similar pumping methods had been employed to unload those "leakers" without any ensuing fires. However, Martin normally does not accept barges in the condition of barge 2003 without having the approval of an insurance inspector. No such approval was sought in this in-stance. Of the barges regularly received by Martin at that time, at least one out of three was a "leaker".

According to Herbert McDonald, another member of Martin's unloading crew, his foreman, Mike Wawczak, who was supposed to be in charge of unloading these barges, did not come to the dock until after the fire started. At that time, Wawczak stated "it wouldn't have happened if they [Martin's maintenance crew] had done it the way I told them to", apparently referring to his instructions telephoned earlier from his house to Opyt.

The trial court found Commercial and Martin both at fault and allowed neither party to recover. Although Commercial has appealed, Martin has filed no cross-appeal. We agree with the trial court that each party was at fault. However, under well-settled principles of maritime law, Commercial was entitled to recover half its damages.

### Commercial's Fault

 In reviewing the findings of the admiralty court, the "clearly erroneous" rule governs. In re Rapp's Petition, 255 F.2d 628, 632 (7th Cir. 1958). In considering Commercial's fault, it must be remembered that maritime courts should be "less ready than the shore courts to find that a subsequent wrongful act by one party [Martin] breaks the chain of causation connecting the accident with the prior negligence of the other party [Commercial]". Gilmore and Black, The Law of Admiralty (1957) p. 404. The reason for this willingness to attribute causative fault to the party first negligent is because in admiralty recovery is not wholly defeated by contributory negligence (idem).

 The District Court found that Commercial had delivered an unseaworthy vessel, namely barge 2003, to Martin. In view of the 35-foot by two-inch hole in the hull of the barge, causing gasoline to escape therefrom, this finding was clearly proper. However, the charter relieved Commercial of any unseaworthiness liability with respect to the cargo.

The charter between the parties was for private carriage, so that the provision in the Harter Act (46 U.S.C. § 190) voiding such an exculpatory clause is inapplicable.

■ The *force majeure* clause of the contract relieved Commercial from any liability for damage resulting from "unseaworthiness of the tow unless caused by want of due diligence on the part of the Carrier [Commercial] to make the tow seaworthy." Here Commercial discovered the unseaworthiness of the barge when it reached Lake Peoria, Illinois, on December 21, 1957. Nevertheless, Commercial exerted no "due diligence * * * to make the tow seaworthy." Commercial asserts that its obligation as to seaworthiness ceased when the barge left Houston, Texas, for Illinois. There is no such limitation in the *force majeure* clause. In a recent case involving an injury to a seaman on a trawler, the Supreme Court held that an owner's duty to furnish a seaworthy ship is no "less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port". Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941. The Court did not limit its decision to liability for personal injuries. Even in cases not involving personal injuries, "By 1853 the English courts * * * [were] recognizing that American courts had just as clearly held the owner liable and the insurer exonerated for losses occasioned by unseaworthy conditions subsequently arising" (362 U.S. at pp. 558–559, 80 S.Ct. at p. 937, dissenting opinion of Mr. Justice Frankfurter). In point too is Monsanto Chemical Co. v. No. 3 Bull Towing Co., 326 F.2d 18 (6th Cir. 1963), certiorari denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 497, holding a barge owner liable for damages where the barge had apparently become unseaworthy during the voyage.[5] Mississippi Valley Barge Line Co. v. Cooper Terminal Co., 217 F.2d 321, 323–324 (7th Cir. 1954),

also recognizes the duty to deliver a seaworthy vessel. In the light of the *force majeure* clause, as illuminated by these authorities, Commercial was clearly bound to deliver seaworthy barges to Martin. This obligation was violated.

■ To avoid the obligation to tender a seaworthy vessel, Commercial relies upon F. E. Grauwiller Transportation Co. v. Exner Sand & Gravel Corp., 162 F.2d 90 (2d Cir. 1947) to show that Martin could have refused the barge or else accepted her with a requirement of exerting a higher degree of care in light of unseaworthiness. In *Grauwiller*, there was a finding that the scow was seaworthy when delivered. There the charterer could with impunity choose not to load the vessel in view of the owner's clear breach of contract by not having a bargee aboard. Here if Martin refused to unload the gasoline, Commercial would be alleging a breach of contract. Furthermore, barge 2003 was abandoned by the *Spencer* while gasoline was leaking onto the canal waters from the barge's tank No. 3. Martin was unable to determine the unseaworthiness of barge 2003 until it completed the gauging of the faulty tank No. 3 an hour or more after the departure of the *Spencer*. If Martin had refused to pump then, a significant fire hazard would have been created. Because of the markedly different circumstances, *Grauwiller* is not dispositive here.

■ Next, the admiralty court found that Commercial had a duty to notify Martin of the damage to barge 2003 discovered by Commercial three days before the barge was delivered to Martin. Hugev v. Dampskisaktieselskabet International, 170 F.Supp. 601, 610–611 (S.D. Cal. 1959), affirmed, 274 F.2d 875 (9th Cir. 1960), certiorari denied, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147, marshals the authorities acknowledging that duty. If Martin had been afforded appropriate notice, the unloading could have been performed more carefully, with adequate fire-fighting equipment already at

---

5. In the *Monsanto* case, a cord had become intertwined in the threads of a cargo valve, resulting in malfunctioning of the

valve. The carrier made no attempt to produce evidence that the defect did not exist at the commencement of the voyage.

hand. If the fire department had been summoned before the conflagration, it would have dispersed the gasoline on the water with a detergent, thus significantly reducing the risk of fire. Also, earlier gauging and pumping of tank No. 3 could have been accomplished, when less gasoline was afloat on the Sag Canal. Advance warning would have enabled Martin to have more men on duty, including licensed tankerman Wawczak. This would have freed a man to watch the leakage from the starboard side of barge 2003 in order to determine when to begin the pumping of tank No. 3.

Finally, Commercial violated Coast Guard regulations which its own brief labels a statutory "rule", "regulation" or "enactment". These regulations required Commercial to give the Coast Guard notice of material damage to its barge.[6] Commercial does not deny that if such notice had been given, it would not have been permitted to proceed through the five locks between Lake Peoria and Martin's dock. The regulations also required Commercial to have a licensed officer or certificated tankerman on duty to perform transfer operations.[7] Under The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, and the many subsequent cases following it, these violations cast on Commercial the burden of showing that its violations could not have contributed to cause this fire. Commercial has not satisfied this burden and therefore must be deemed at fault.

### Martin's Fault

The admiralty court found that Martin neglected to call alongside sufficient fire-fighting and fire-prevention equipment after the gauging of tank No. 3 disclosed the presence of a hole in the hull and after Martin saw gasoline leaking from tank No. 3 into the Sag Canal. In addition, the court found that Martin's unloading crew showed little more than the same concern it demonstrated toward

less dangerous "leakers". These findings were amply supported by the evidence.

The record shows too that Martin's unloading personnel did not observe what quantities of gasoline were flowing from tank No. 3 between the first pre-pumping observation and the second observation at 6:45 A.M. It was negligent of Martin as a matter of law not to have watched the emission from tank No. 3, so that it could have switched pumping from all other tanks of the barge as soon as the water seal had broken in tank No. 3. As the court below found, if Martin had started pumping tank No. 3 when its water seal broke, "it is doubtful that this mishap would have occurred."

Lastly, Mike Wawczak, who was the certificated tankerman assigned to this unloading, was absent without leave, and Martin assigned no other licensed tankerman to supervise the unloading. This was admittedly a violation of the Coast Guard regulations.[8] Martin employee William Ripley testified that the Coast Guard regulations required Martin to have a licensed tankerman in charge of the unloading. Therefore, under The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, Martin was required to show that Wawczak's absence could not have contributed to the accident. Martin did not satisfy this burden.

On the evidence in the record, we accept the trial court's findings that each party was at fault. Therefore, the next question to be determined is the proper measure of damages.

### Divided Damages

Because both parties were at fault, the admiralty court denied any recovery. This was improper under well-settled admiralty law that property damages are to be equally divided in mutual fault cases. The authorities supporting the equal division rule were recently collected in this Court's opinion in N. M. Paterson & Sons, Limited v. City of

6. See Note 2, supra.

7. See Note 3, supra.

8. See Note 3, supra.

Chicago, 324 F.2d 254, 257–258 (7th Cir. 1963) and are controlling on the issue of damages. Under the historic admiralty rule of divided damages in property damage cases of mutual fault, the aggregate damages of the two parties should have been divided equally. Since Martin chose not to cross-appeal from the judgment below, Commercial is entitled to an award of half its damages. The cause must be remanded to the District Court for such a determination.

Reversed and remanded.