THE SAN SIMEON.

In re PACIFIC ATLANTIC S. S. CO.

THE COMMERCIAL MARINER.

In re MOOREMACK GULF LINES, Inc.

District Court, S. D. New York.
June 1, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for Commercial Mariner.

MacFarland, Taylor & Costello, of New York City (Willard U. Taylor and Ernest A. Fintel, both of New York City, of counsel), for petitioner San Simeon.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar and Leonard J. Matteson, both of New York City, of counsel), for cargo claimants.

Neuer & Neuer, of Brooklyn, N. Y. (Howard M. Long, of Philadelphia, Pa., of counsel), for Pauline Levey and others.

MACK, Circuit Judge.

On January 22, 1931, about 5:30 a. m., the steamer San Simeon, proceeding up, and the steamer Commercial Mariner, bound down, the Delaware river, collided near a bend in the channel marked by the intersection of the Cherry Island and Deepwater Point Ranges. The Commercial Mariner sank by the stern; the San Simeon suffered some damage.

Petitions for limitation of liability were filed by the owners of each of the steamers; while not consolidated, the proceedings have been heard together. Inasmuch as the Commercial Mariner limited liability is negligible, the significant controversy occurs in the San Simeon proceeding. Claims therein have been filed by owners of cargo laden on the Commercial Mariner, by the administratrix of Carl H. Anderson, engineer on the Commercial Mariner who was killed in the disaster, and by the owner of the Commercial Mariner; the fund is inadequate to satisfy all of them. Each petitioner takes the position that the ship of the other was solely at fault; cargo and death claimants seek to establish that both ships were negligent, and thus to subordinate the claim of the owner of the Commercial Mariner in the San Simeon proceeding to their own.

The wreck of the Commercial Mariner lay off the western edge of the channel, bow downstream, and 1,101 feet below buoy I–C, which marks the bend in the channel. Except for this fact, practically every other material fact is hotly contested, and, as is common in collision cases, the testimony is irreconcilable. While counsel for the two vessels apparently are willing to concede sole liability of one or the other on the basis of a determination of whether the place of collision was above or below the buoy, the other claimants naturally do not join therein; they assert joint liability of the two vessels. This concession, however, obviates consideration of other factors bearing on San Simeon's faults. If the collision occurred in the immediate vicinity of the wreck, the San Simeon concededly is liable, either solely or jointly with the Commercial Mariner, for, in that event, her attempted starboard to starboard passing would have been without justification. The Victory and the Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519 (1897); A. H. Bull S. S. Co. v. United States, 34 F.(2d) 614 (C. C. A. 2d 1929). Therefore we must first determine whether or not the collision did occur at or near that place.

The rent in the side of the Commercial Mariner measured 26 by 27 feet, and yielded access to two-thirds of the length of the ship. Dennison, the wreckmaster, and Virden, an expert called on behalf of cargo and death claimants, considered that such a hole must have caused sinking within a very few seconds. The Commercial Mariner's anchor, which, according to the testimony of members of both crews, was dropped almost immediately after the crash, led straight up and down on the wreck according to photographs taken a few hours thereafter. Moreover, if, as the San Simeon owner contends, the collision had taken place above the bend and the Commercial Mariner had drifted for several minutes before sinking, she would presumably have been carried to the opposite edge of the channel by the ebb tide, inasmuch as, in my opinion, it is shown by the testimony to set to eastward. Finally, although in the main, the testimony of each crew was, as is usual in these cases, in accordance with the contention of the shipowner, Hetland, quartermaster of the San Simeon who was at the helm when she struck, testified that the Commercial Mariner sank "about immediately, almost—just a few seconds afterwards."

On the entire evidence I am still satisfied, as I was at the oral argument, that the collision took place below the bend on the western side of the channel, and that the San Simeon in any event was at fault.

The facts that govern judgment upon the conduct of the Commercial Mariner are not as clear. Of one serious violation of duty she was plainly guilty, she had no lookout forward. The burden is cast upon her of es-

tablishing that her failure to have a lookout did not contribute to the collision. The Ariadne, 13 Wall. 475, 20 L. Ed. 542 (1871); The Great Republic, 23 Wall. 20, 23 L. Ed. 55 (1874); The Albert Dumois, 177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751 (1900); The Madison, 250 F. 850 (C. C. A. 2d, 1918); The Herbert L. Pontin, 50 F.(2d) 177 (C. C. A. 2d, 1931). In my opinion, the Commercial Mariner gave the one-blast signal before the San Simeon gave the two; the positive testimony of the Commercial Mariner's master and chief officer in this connection must be accorded greater weight than the negative testimony on behalf of the San Simeon. After the two blasts by the San Simeon, followed possibly by a second single blast by the Commercial Mariner, the danger signal and one blast by the Commercial Mariner preceded the collision.

■■ It is upon the length of the interval between the Commercial Mariner's original one and the San Simeon's two-blast signals, the distance between the ships at the latter's blasts, and the lapse of time between the San Simeon's signal and the collision, that the fault or freedom from fault of the Commercial Mariner chiefly depends.

Lipsberg and Callahan, master and chief officer respectively of the Commercial Mariner, deposed that, at the time of her one-blast signal, the ships were about a mile and a half apart. Before the board of local inspectors at Philadelphia, both Lipsberg and Bonner, master of the San Simeon, estimated the distance between the ships when the San Simeon blew two blasts, at about a quarter of a mile. Since the speed of the Commercial Mariner was about eleven knots and the San Simeon's about nine, on these estimates of distance, nearly four minutes elapsed before the Commercial Mariner received the answering cross-signal, an interval, grossly excessive, during which to continue on without both repeating her own signal and checking her way. This alone would suffice to condemn her. Article 18, rule 3 (33 U. S. C. § 203 [33 USCA § 203]); The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126 (1899); A. H. Bull S. S. Co. v. United States, 34 F.(2d) 614 (C. C. A. 2d, 1929). The proper interval is conceded by the Commercial Mariner to be something less than a minute, and, in my judgment, could be no more. It is true that on other occasions Lipsberg gave lower estimates of the distance between the ships when the Commercial Mariner blew one—"between one-half and three-quarters of a mile"; "perhaps less than a mile"; and that Benner, at the trial, testified that the distance between the vessels, when the San Simeon blew two, was between three-quarters of a mile and a mile. Moreover, Lipsberg testified that less than a minute elapsed between his one and the San Simeon's two. However, a lookout might obviously have made for a livelier perception of lapse of time and diminution of distance than in fact obtained, and doubts as to the effect of the Commercial Mariner's failure to have a lookout must be resolved against her.

■ The evidence bearing upon the interval between the San Simeon's two-blast signal and the collision is equally confused. Lipsberg and Callahan of the Commercial Mariner, and Hetland, of the San Simeon, estimated it to be about a minute. Callahan's testimony with regard to events during and immediately before this interval, however, is quite self-contradictory. Benner and Johanson of the San Simeon give the interval as about two minutes, but the testimony of each in this connection, taken as a whole, is unconvincing. Lipsberg and Benner, as hereinabove stated, had at one time testified that the distance between the vessels at the time of the two-blast signal was about one-quarter of a mile. This substantially accords with the estimate of one minute before the collision. But, as above stated, Benner, at the trial, testified that the distance was more than three-quarters of a mile. There is evidence that the angle of collision was 75°, which, in the light of the situation of the vessels prior to the San Simeon's swing and of the San Simeon's maneuvering capacity, indicates an interval of two minutes; but there is likewise testimony that the angle was considerably smaller. Out of the confusion, two facts emerge. It is clear that the Commercial Mariner's danger signal which caused the San Simeon to start reversing was blown only some seconds before the collision; and it is clear that the margin of failure to escape was very narrow, a matter of five or six seconds running by the Commercial Mariner or retardation on the part of the San Simeon. Quickness in response was at a premium, and moments of delay were fatal. Had the Commercial Mariner blown her danger signal ten seconds earlier, the disaster might have been avoided. Here, again, the possible consequences of the failure to have a lookout are plain.

I find, therefore, that the Commercial Mariner has not shown that her lack of a lookout did not contribute to the collision.

The Commercial Mariner in going ahead

at full speed without waiting for an answer to her one-blast signal, and after receiving the cross-signal, took her chances of success. She came within a few seconds of accomplishing a safe passing. But, as she failed, she cannot escape the consequences of not stopping and reversing when, after the permissible interval, no passing agreement was reached. Whether or not she would thus have averted all damage is immaterial. The collision was due, not to mere error of judgment in extremis, but to her decision, before she was in extremis, to take her chances of clearing.

Both vessels must therefore be held at fault. Decrees may be settled and findings submitted in accordance with this opinion on three days' notice.