Richard P. **DORAN**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. No. 64–68.**

United States District Court
D. Puerto Rico.

Oct. 21, 1969.

Juan R. Torruella, San Juan, P. R., for plaintiff.

Harold G. Wilson, Asst. U. S. Atty., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLU-SIONS OF LAW

CANCIO, Chief Judge.

This action was brought pursuant to the Public Vessels Act, 46 U.S.C. § 781. After a trial of the case, the Court, having received the evidence including the credibility of the witnesses and having evaluated the documentary evidence offered and admitted, together with the proposed findings of fact and conclu-sions of law, and being therefore fully advised in the premises, now makes its findings of fact and conclusions of law by adopting for the most part the pro-posed findings of fact and conclusions of law as submitted by the defendant, but including some of those of the plaintiff, both of them as amended by the Court in order to more accurately reflect the views of the Court in regard to the is-sues and the evidence pertaining thereto. The Court's findings of fact and conclu-sions of law are therefore as follows:

### FINDINGS OF FACT

1. On February 3, 1967 plaintiff, Richard P. Doran, hereinafter called Dor-an, was the owner of the catamaran-type sailing vessel MANGO, 48 feet long and 24 feet wide, with its home port at San Juan, Puerto Rico (Tr. 111). The MANGO was a Coast Guard certified passenger vessel. She carried a main-sail, jib and auxiliary engine (Tr. 78, 375; Gx. H). Her displacement (D.W. L.) is 8000 pounds and she had a draft (D.W.L.) of 1' 5" (Tr. 379–380; Px. 8(b)).

As plaintiff intended to build a vessel to transport passengers for hire, the specifications and detailed plans for the MANGO first had to be examined and approved by the Merchant Marine Tech-nical Center of the United States Coast Guard (Tr. 363–364, 577–578; Px. 8(a)–(d); 46 C.F.R. 176.01–10(c); 177.01–177.05–1(d)).

The specifications of the MANGO, as finally approved by the Coast Guard, provided that "vessel control is from a forward cockpit to provide maximum visibility for the operator" and this is shown on the approved plans to be for-ward of the mainmast (Tr. 577–578; Px. 8(a), 8(b); Gx. H; 46 C.F.R. 176.-25–1(b)).

The construction of the MANGO then went ahead and she was fitted out so that the helmsman in the cockpit con-trolled the main and jib sails by the sheets running to these sails, which were fastened to cleats within his reach (Tr. 375). Forward of the MANGO's

mast was a built-in helmsman's cockpit (also called "control station" and "navigator's cockpit") and installed therein were the steering wheel and mechanism which controlled the direction of the rudders on the stern of each hull (Px. 8(a)). In addition, the cockpit contained the compass, life ring, flares and foghorn (Tr. 239, 364–365).

Behind the MANGO's mast and cabin structure was the passenger cockpit, with seating arrangements for 41 people (Gx. I). At the after end of this cockpit on the center line was a built-in bar for service of drinks to the passengers (Tr. 448, 453–454; Gx. D). The port and starboard hulls extended aft of the bulwark, surrounding the passenger cockpit by about six feet (Px. 8(e); Gx. H).

The Coast Guard inspection found the MANGO, as built, conformed to the approved specifications and plans, and the Officer in Charge, Marine Inspection, San Juan, Puerto Rico, accordingly, issued a certificate for the vessel to carry 41 passengers for hire (Tr. 375, 577; Gx. G, I; 46 C.F.R. 176.01–10(c)).

Approximately four weeks later, without approval from the Officer in Charge of Marine Inspection, the hand steering wheel mechanism at the control station was removed and the MANGO was thereafter steered by manipulating a tiller bar with the steerman's foot, while he stood on the stern of either hull and steadied himself by grasping a ⅞" wire back stay (Tr. 218–219, 363–364).

2. On said date of February 3, 1967, defendant United States of America, hereinafter called Defendant, was the owner of the Submarine USS CLAMAGORE, which vessel is a public vessel and was at all times herein pertinent under the command of Commodore William Gunn. The CLAMAGORE is a Guppy III type diesel-attack submarine, 322' in length, 27' in beam and 18' in draft, displacing 2074 tons.

The captain of the CLAMAGORE, Commander Gunn, had taken over command of the submarine in June 1965.

At the time of the occurrence of the facts of this case, he had 17 years of service in the Navy, of which 14 were on sea duty. At the time of the collision, the CLAMAGORE was stationed at San Juan. Commander Gunn had been in and out of port 22 times under varying conditions (Tr. 602–604).

3. At approximately 1715 hours of said date, MANGO left its pier in the harbor at San Juan, Puerto Rico, and proceeded West along San Antonio Channel, turning northwards at La Puntilla point towards the harbor entrance. Aboard MANGO were 12 paying passengers, as well as her regular crew, which consisted of her master, Doran, and Miss Terry McCaffrey. A non-paying passenger, Mr. Arnold Vandim, had no other duty to perform except to help raise the sails since Miss McCaffrey was not capable to do so. (Tr. 142–143, 154).

The CLAMAGORE surfaced well out to sea and commenced her approach to San Juan Harbor. The maneuvering watch had been set by experienced and competent personnel manning all watch stations (Tr. 605).

Commander Gunn was at his regular station for entering port. He stood on top of the bulwark of the 24-foot-high sail that projects above the submarine's hull, where there is special rigging for this purpose (Tr. 605–606).

Just below was the deck of the bridge, which was surrounded by the bulwark upon which Commander Gunn was stationed (Tr. 605–606). At the forward end of the bridge were the port and starboard lookouts, and directly behind them the executive officer, the officer of the deck, the junior officer of the deck, the maneuvering watch quartermaster, and two phone talkers. Sitting at Commander' Gunn's feet was a quartermaster who maintained the quartermaster's log (Tr. 607–608).

The CLAMAGORE made her approach to the harbor on the Bar Channel ranges, which are in line for a true course of 188° (Tr. 611). She steered a

course to the right of the ranges so as to come in on her own right half of Bar Channel (Tr. 613). The CLAMAGORE was on standard speed, which was approximately 13.2 knots and is the speed at which she is most maneuverable while navigating on the surface (Tr. 652).

4. MANGO proceeded to the vicinity of Buoy No. 3 on the Bar Channel, with Terry McCaffrey at the helm. Miss McCaffrey was not qualified to act as a lookout or a helmsman (Tr. 446). She had only been employed two days before the accident and that was for the purpose of serving drinks and keeping the boat clean. Just once before the accident had she ever steered the MANGO (Tr. 261, 243). Miss McCaffrey stood at the end of the starboard hull grasping a 7/8″ wire back stay to steady herself, and steered the MANGO with her foot by pushing or pulling on the tiller bar that was attached to the two rudders (Tr. 446–447; Gx. D). The navigation of the MANGO remained in this state of affairs until the possible collision with the CLAMAGORE was foreseen (Tr. 617–618). At the vicinity of Buoy No. 3, the last of several submarines that had been entering the harbor was sighted by Doran, Miss McCaffrey, and Vandim. That submarine was CLAMAGORE. Doran later took over the helm of the MANGO from McCaffrey.

5. At approximately the same time that MANGO's crew sighted CLAMAGORE, ten crew members aboard CLAMAGORE sighted MANGO in the vicinity of Buoy No. 3. The time was then 1744 and CLAMAGORE was proceeding on a course of 189° T at a speed of 13.2 knots, and was at location 18°29′ 18.5″ North, 66°7′ 33.5″ West. CLAMAGORE was then 1240 yards outside the entrance buoys.

6. As we will see, there was a collision between the two vessels. The area of the collision is known as "Bar Channel", the first channel an inbound ocean-going vessel must transit to enter the port of San Juan (Tr. 610; Charts in Evidence). The seaward end of the channel where the Inland Rules (33 U. S.C. §§ 172–232; 33 C.F.R. 82.200) become applicable is marked by Bar Channel Buoys "1" (left side entering) and "2" (right side entering). For an entering vessel, the odd numbered channel buoys (black) are to the port (left or eastward) and the even numbered (red) to starboard (right or westward). The center line of this reach of the 500-foot-wide channel is defined by range lights down to Bar Channel Buoys No. "3" and "4", a distance of about 500 yards parallel to the shoreline of Punta del Morro (Tr. 543). This reach of Bar Channel runs generally in a North-South direction (008°T–188°T (Tr. 611)). The remaining reach of Bar Channel, commencing at Buoy No. 3 (quick green flashing light), continues on, bending to the Southeast and eventually broadens to a width of 1200 feet where it joins "Anegado Channel".

7. When approaching on the ranges from the high seas, Punta del Morro, to the east or port hand, initially obstructs a clear view of the channel and waters to the landward that lie below quick green flashing Buoy No. 3. However, in continuing to advance along this line of approach and prior to coming on to Bar Channel proper, the Punta del Morro obstruction has a relative motion off to the left and full range of vision opens for inbound or outbound vessels.

8. While the CLAMAGORE was to the seaward of Bar Channel and Buoys 1 and 2, the port lookout and other bridge personnel all observed the MANGO at about the same time as did the navigator, Lieutenant Commander Wilson, who was stationed in the conning tower on the high-low magnification periscope (Tr. 540, 643–644). At the time of first sighting, the MANGO emerged into view just below the point of land that is to the southeastward of Bar Channel quick green flashing Buoy No. 3 (Gx. K, L–1, L–2, L–3; Gx. N. showing point of land as marked that corresponds to foregoing exhibit photograph; (Tr. 545–546, 613, 647)). The time of this visual observation of the MANGO was not la-

ter than 1745 and the sailboat was on a line of sight distance of about ¾ of mile (Tr. 609, 612–614, 552; Gx. N. and Gx. 0–1, 0–2, bearings and time).

9. The CLAMAGORE's geographical location at 1745 was fixed by .bearings taken by the navigator and is shown on the plot of the Chart in Evidence (Tr. 613–614, 552; Gx. N, O–1, O–2).

10. Both Commander Gunn and Lieutenant Commander Wilson continued watching the MANGO and observed that after this first sighting she settled on a northerly course that was to the east of Bar Channel proper. The two vessels were then on laterally displaced reciprocal courses for a safe port-to-port passing (Tr. 545–546, 613–614, 644; Gx. L–1, L–2).

11. The MANGO continued to hold to this northerly course until she passed Bar Channel Buoy No. 3, still outside the channel limits towards the shoreline to her east (Tr. 545–546). During this interval, there was no risk of collision and the MANGO could have continued on the same course until the vessels safely passed port-to-port (Tr. 545–546, 614, 615, 654–655, 673).

12. However, just as the submarine entered upon Bar Channel proper, it was observed that the MANGO's head (bow) was beginning to fall off to the left (port) and that she was deviating to a course towards the navigable channel (Tr. 547, 614, 649, 673).

13. The CLAMAGORE, upon observing this first deviation in MANGO's course, immediately sounded the danger signal of five short blasts and reduced speed to ⅓ ahead (Tr. 650, 654, 670). However, the head (bow) of the MANGO was then seen to progressively fall further off to the left, during which time the CLAMAGORE executed order one on top of another which consisted of stopping motors, back ⅔'s, back emergency and right 20° rudder (Tr. 614, 650, 666; see also Tr. 591–592).

14. The CLAMAGORE was at back emergency while the MANGO was still off her port side at a distance of 238

yards (Tr. 679, Gx. 1–5, L–6, L–7). The CLAMAGORE was on her edge of Bar Channel (western side) and her bow end struck the MANGO on her starboard side about amidship (Gx. N; Tr. 621–622, 645).

15. At the place of the collision the sea was calm, with ½ feet seas, and a 4–9 mile breeze from the northeast.

16. When the MANGO was below Bar Channel Buoy No. 3 (quick flashing green) and to the southeast of that buoy, she was outside the navigable channel on a northerly course of line and, had a helmsman been stationed in the cockpit forward of the mainmast, he would have had an unobstructed view of the approaching CLAMAGORE. The course MANGO was on originally did not involve risk of collision and, had it been maintained, the vessels would have safely passed one another, port-to-port (Findings, 10, 11).

17. During all times pertinent to this collision, the wind did not come around to a lesser degree (045TT) than a northeast direction (Tr. 103; Gx. E) and MANGO could sail up to within 45° of the direction of the wind when close hauled (Tr. 104).

18. When the MANGO was below Buoy No. 3, a capable helmsman could have sailed the vessel on a northerly course, because the wind was coming from a direction that was not less than 45° off her starboard (right) side and a safe port-to-port passage would have been accomplished. MANGO's change of course to port (left) when north of Bar Channel Buoy No. 3 brought her directly across the CLAMAGORE's projected track and can only be attributed to the failure to have a proper lookout and a qualified helmsman steering the sailboat at the navigator's cockpit, where there was "maximum visibility."

19. At the time the approaching submarine should have been seen and kept under observation from the MANGO, Plaintiff was in the passenger cockpit talking to his passengers. Plaintiff was the licensed navigator of the MANGO

and it is evident that, before the emergency, his time and attention were devoted to the passengers and not to the safe and proper navigation of the sailboat (Tr. 83–84, 383). There is no need to consider Mr. Vandin's actions, as he was only aboard the MANGO for a ride and, as previously explained, had no duties to perform, except to help raise the sails because Miss McCaffrey was not capable to do so (Tr. 142–143, 154).

20. The MANGO had no person aboard whose duty was to act as a lookout and, at all times pertinent, the vessel was navigated without any lookout at all.

21. The MANGO had auxiliary power which had been used at the commencement of this excursion trip around the harbor, but Plaintiff gave no explanation why it was not used to avert collision or otherwise to assist in the vessel's safe navigation.

22. I find that the location in the vessel at which the MANGO was being steered by Miss McCaffrey was with the approval of Plaintiff and that he himself had previously engaged in such a practice.

23. On February 3, 1967, and for an appreciable time before that date, the MANGO was not being navigated from the helmsman's cockpit, for the steering mechanism had been removed (Tr. 364).

24. I find that the 500-foot-wide Bar Channel and its approach from the seaward constitute a narrow channel and that the CLAMAGORE could only safely navigate within the limits of that channel. As the MANGO only had a draft of 1′5″, she had more than ample waters for safe navigation outside the limits of the Bar Channel (Tr. 380; Px. 8(d), Gx. H).

25. Mr. and Mrs. Lucas and Mr. Boucher, who were passengers aboard the MANGO at the time of the collision, and the only passengers to testify at trial, had no interest in the outcome of the suit and were entirely unbiased witnesses. Their testimony clearly establishes that neither Plaintiff nor Miss McCaffrey were aware of the approaching CLAMAGORE until it seemed too late for the MANGO to avoid collision; and it was at this time that Mr. Doran assumed control of the MANGO.

Based on these facts, the Court reaches the following:

## CONCLUSIONS OF LAW

■■ Jurisdiction is conferred upon the Court by 28 U.S.C. § 1333. The courts uniformly hold that "* * * lookouts must be persons of suitable experience, properly stationed on the vessel and actually and vigilantly employed in the performance of that duty." Jett v. Texas Co., 73 F.Supp. 699, 706 (D.Del. 1947). The lookouts must be stationed forward so the view is unobstructed. Where it was "* * * shown that the vision of one standing behind the wheel was obstructed by the masts" there was a failure to have a proper lookout. The Albatross, 20 F.2d 17, 18 (9th Cir. 1927). In accord, The San Simeon, 1 F.Supp. 506, 507 (S.D.N.Y.1932), aff'd 63 F.2d 798 (2d Cir. 1933). Miss McCaffrey was not shown to be of "suitable experience", nor was she located at the cockpit which afforded "maximum visibility." In requiring that the lookout be stationed forward so as to have an unobstructed view, the courts insist "his [lookout's] sole duty must be that with which he is charged, and he cannot divide this responsibility * * *". The Tillicum, 217 F. 976, 978 (W.D.Wash. 1914), aff'd 230 F. 415 (9th Cir. 1916). Plaintiff did not fulfill the requirements of a lookout, as his personal attention was directed to his passengers.

■ The MANGO did not have a lookout, which is a statutory fault, and Plaintiff's proof failed to show "* * * not merely that [this] fault might not have been one of the causes or that it probably was not, but that it could not have been." The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); Dwyer Oil Transport Co. v. The Edna M. Matton, 255 F.2d 380, 382 (2d Cir. 1958), cert. den. Tug Corporal Corp.

v. Dwyer Oil Transport Co., 358 U.S. 838, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958); Wasson Barge Rental Co., Inc. v. Tug CARRIE D. et al., 296 F.Supp. 933 (E. D.La.1969).

The Coast Guard approved specifications and plans for the MANGO required that the hand steering mechanism be installed at the built-in cockpit forward of the mainmast because the helmsman was afforded "maximum visibility" and could also control the sails by the sheets running to cleats within his reach. Conformity with this arrangement was a prerequisite to the issuance of a certificate to carry passengers for hire (46 C.F.R. 176.01–10(c); 177.05–1(a)–177.05–1(d)).

The Coast Guard regulations further provide that after the MANGO received her certificate to carry passengers for hire *"no major repairs or alterations affecting the safety of the vessel* with regard to the hull * * * or equipment, shall be made without the knowledge and approval of the Officer in Charge, Marine Inspection" (46 C.F.R. 176.20–1(a)), and that "proposed alterations shall be approved by the Officer in Charge, Marine Inspection * * *" (46 C.F.R. 176.20–1(b), italics added). To insure complete protection to the passengers "the safety of the vessel" required she be navigated by the steering mechanism at the built-in cockpit because it provided "maximum visibility" besides direct control of the sails.

The subsequent alteration of the MANGO's hand steering mechanism from the helmsman cockpit forward of the mast to a system of steering with the feet while standing on the stern end of either hull directly involved the safety of the vessel that carried passengers for hire. These alterations were made without the approval of the Officer in Charge of Marine Inspection and were a direct violation of the Coast Guard regulations. (46 C.F.R. 176.20–176.20–5). Plaintiff's failure to take positive action to secure approval for these alterations is analogous to the failure of the corporate barge owner " * * * to give the Coast Guard notice of material damage to its barge" as required by the regulations which constituted a statutory violation. Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7th Cir. 1967).

The Code of Federal Regulations " * * * are required to be judicially noticed," Wei v. Robinson, 246 F.2d 739, 743 (7th Cir. 1957) and " * * * have the force and effect of law and their appearance in the Federal Register is tantamount to legal notice of its contents." United States v. Millsap, 208 F.Supp. 511, 516 (D.Wyo.1962). Plaintiff has failed to prove that his violation of the regulations (46 C.F.R. 176.-20–1(a), 176.20–1(b)) " * * * might not have been one of the causes for this collision * * * or probably was not, but * * * could not have been." The Pennsylvania (supra); Dwyer Oil Transport Co. (supra); Wasson Barge Rental Co., Inc. (supra).

The Inland Rules of the Road, Article 20 (33 U.S.C. 205), which went into effect February 3, 1967, amended the standing provision that when a steam vessel and a sailing vessel were approaching one another so as to involve risk of collision, the steam vessel was to keep out of the way of the sailing vessel.

This privilege no longer exists and the law now provides:

* * * this rule shall not give to a sailing vessel the right to hamper, in a narrow channel, the safe passage of a steam vessel which can navigate only inside that channel (33 U.S.C. § 205, Art. 20).

Plaintiff not only did "hamper" * * * in an narrow channel the safe passage * * * "of the CLAMAGORE which could only * * * navigate inside that channel," but persisted in doing so, which caused the collision.

The MANGO's navigation clearly contravened the purpose for which the law was enacted as is clearly demonstrated in the legislative history for the pro-

posed change. It states in pertinent part:

The effect of the bill would be to provide a clear, positive obligation on the part of the growing number of small craft operators to become aware of the commonsense demands of safety when operating in the areas of limited, narrow channels where larger vessels which can maneuver only within such channels are also operated. (U.S. Code Congressional and Administrative News, Vol. 3, p. 4131, § 1966).

In the circumstances of this case, the MANGO, therefore, was also required " * * * to keep out of the way * * *" and " * * * avoid crossing ahead * * *" of the CLAMAGORE and the failure to do so was a statutory violation of Article 22 of the Inland Rules (33 U.S.C. § 207).

In addition, MANGO violated the Rules of Navigation as they existed even before the present amendment to Article 20 of the Inland Rules (33 U.S.C. § 205). The respective duties of sailing vessels and steam vessels while approaching one another are clearly enunciated in Golding v. The Steamship Illinois, 103 U.S. 298, 26 L.Ed. 562, 563 (1881), where the Supreme Court held:

The responsibility of avoiding a collision with a sailing-vessel is put by the Act of Congress and the sailing rules primarily on a steamer. But the sailing-vessel is under just the same responsibility to keep her course, if she can, and not embarrass the steamer, while passing, by any new movement. A steamer has the right to rely on this as an imperative rule for a sailing-vessel, and govern herself accordingly. Otherwise it would at times be impossible for a steamer to get ahead at all in the thoroughfares of navigation.

To the same effect, see Bedell v. The Steamship Potomac, 75 U.S. [8 Wall.] 590, 591, 19 L.Ed. 511 (1870). Also the Court, in The Plymouth, 26 F. 879, 880 (C.C.D.Me. 1886), had occasion to pass upon the respective duties of steam vessels meeting with sailing vessels, and went on to state:

The steam-tug was required to keep out of the way of the sailing vessel, provided the latter kept her course. But it was imperative upon the sailing vessel to keep her course, and if she deviates therefrom, and a collision happens, the steamer is not liable therefor. (Citations omitted) * * [and the failure of the sailboat to do so was a fault] * * * which relieves the tug from any liability for the collision.

The MANGO having settled on a northerly course was legally obligated to hold to that course so that the vessels could have safely passed port-to-port. There was nothing to prevent MANGO from holding to her course that did not involve risk of collision, and CLAMAGORE's navigators had every right to rely upon the sailboat's duty to do so. Furthermore, as there was no foreseeable risk of collision, CLAMAGORE had no duty to slacken speed, stop or reverse. The Scotia, 81 U.S. [14 Wall.] 170, 181–182, 20 L.Ed. 822, 823–824 (1872); The Free State, 91 U.S. 200, 204–205, 23 L.Ed. 299 (1875). In similar circumstances, a Court of Appeals in Jacobsen v. Dallas, P. & A. Nav. Co., 114 F. 705, 707 (9th Cir. 1902) affirmed the trial court's decision holding a sailboat solely at fault because:

The Court found as a fact that the sailboat was proceeding on a course with respect to the steamer which did not at first involve a risk of collision, but that it changed its course and sailed directly into the pathway of the steamer, incurring the peril of an immediate and unavoidable collision.

The MANGO was negligent in deviating to a course across the projected track of the CLAMAGORE and this was a proximate cause of the collision.

Plaintiff's negligent navigation is also directly attributable to not knowing or understanding the proper application of the rules of the road. This is made evident by the course of events commencing

with the CLAMAGORE's danger signal of five short blasts.

CLAMAGORE saw that MANGO's deviation on a course towards the channel, if continued, would involve risk of collision and this should have been just as obvious to plaintiff. The CLAMAGORE therefore gave the commonly understood danger signal which should have clearly signified to MANGO that by deviating from her original safe course she was standing into danger. Viewed in these circumstances, plaintiff's assumption that CLAMAGORE's five short blasts could only mean that the submarine did not understand MANGO's "course of intentions", as when sounded by one of two steam vessels in a crossing situation (Inland Rule III, 33 U.S.C. § 203), has long since been laid to rest in Merritt, Chapman & Scott Corporation v. Texas Co., 98 F.2d 719, 721 (2d Cir. 1938). There the renowned Admiralty Judge Learned Hand, Circuit Judge, stated:

> It is quite true that literally Inland Rules, art. 18, Rule 3 (Section 203, title 33, U.S. Code, 33 U.S.C.A. § 203), does not call for a 'danger signal' at all; it directs a master to blow only when he 'fails to understand the course or intention of the other', and a purist might argue that it did not cover a case where he knew well enough that 'course or intention', but wished to say that he thought it dangerous. *But it has been universally interpreted as applying to cases where the master believes that safety requires a change of navigation, and by far the greater number of occasions of its use are just of that sort.* (Citations omitted, italics added).

The requirement that vessels capable of sounding warning signals do so even though they are not provided for in the Rules has often been recognized in a variety of circumstances. The Rules do not prohibit such signals and it becomes a matter of prudent seamanship "* * * to give such reasonable notice of obvious danger as the special circumstances may require." The City of Alex-

andria, 31 F. 427, 430 (S.D.N.Y. 1887), referring to the General Prudential Rule now Art. 27, 33 U.S.C. § 212. See also Villain & Fassio E. Compagnia etc. v. Tank Steamer E. W. Sinclair, 313 F.2d 722, 724 (2d Cir. 1963), affirming 207 F.Supp. 700 (S.D.N.Y. 1962); Gulf Oil Corporation v. The Socony No. 16, 162 F.2d 869, 870 (2d Cir. 1947).

Another contention by plaintiff that the CLAMAGORE erroneously sounded a danger signal of four short blasts while in international waters and she should have given five is inconsistent with the facts and law. There was positive testimony and evidence that the CLAMAGORE gave five blasts which is not to be outweighed by plaintiff's negative testimony that he only heard four blasts, The Thingvalla, 48 F. 764, 767 (2d Cir. 1891). The San Simeon, 1 F. Supp. 506, 508 (S.D.N.Y. 1932) affirmed 63 F.2d 798 (2d Cir. 1933).

In addition, there is no limitation on the number of short blasts that may be given but only as to the minimum that shall be sounded (four or more, under Inland Rule III, 33 U.S.C. § 203; five or more, under International Art. 28(b), 33 U.S.C. § 1090). Assuming *arguendo* that CLAMAGORE gave four blasts in international waters, the projected courses of the vessels met in inland waters. This being the case, plaintiff should have known the CLAMAGORE's signals and navigation would comply to the Inland Rules. The Knoxville City, 112 F.2d 223, 226–227 (9th Cir. 1940); Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697, 703 (E.D.Va. 1960) aff'd Gratsos v. The Moisie Bay, 287 F.2d 706 (4th Cir. 1961).

Plaintiff's excuse in not taking timely action to avoid collision for fear any change of the MANGO's course would "cause confusion" to the navigators of the CLAMAGORE has repeatedly been condemned by the courts. Invariably the courts have held that "the Rules [of the Road] do not admit of violation for fear of causing confusion" to

the crew of the approaching vessel. Petition of Diesel Tanker A.C. Dodge, 234 F.2d 374, 377 (2d Cir. 1956) cert. den. A.C. Dodge, Inc. v. J. M. Carras, Inc., 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163 (1956); National Bulk Carriers v. United States, 183 F.2d 405, 408 (2d Cir. 1950). It is axiomatic that the Rules were enacted to prevent and not cause collisions. The Inland Rules (33 U.S.C. § 201) clearly advise mariners that where an approaching vessel presents a constant bearing, risk of collision "should be deemed to exist" and the courts go on to hold that "a collision course reasonably observable, visually or otherwise, must be avoided." Miller v. Semet-Solvay Division, Allied Chemical Corporation, 460 F.2d 1037 (4th Cir. 1969). In the frequently cited case of Ocean S.S. Co. of Savannah v. United States, 38 F.2d 782, 784 (2d Cir. 1930), the court emphasized that "* * * it must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid" (citations omitted).

The Supreme Court, in The Merrimac, 81 U.S. [14 Wall.] 199, 203, 20 L.Ed. 873 (1871), stated in pertinent part that:

> Most collisions are inevitable at the moment they occur, but the *primary rule is that precautions must be seasonable* and if they are not * * * and a collision ensues in consequence of the delay, it is no valid defense to say that nothing could be done at the moment to prevent the [collision]. * * * Inability to prevent a collision usually exists at the time it occurs, but it is generally an easy matter to trace the cause of the disaster to some negligent or unskillful act, or to some antecedent omission of duty on the part of one or the other or both of the colliding vessels."

Plaintiff's failure to take timely precautions at any time after there was risk of collision for fear of causing confusion is an inexcusable fault and a proximate cause of this collision.

In this case, the direct evidence of defendant's eye-witnesses who established the CLAMAGORE's geographical locations by means of the true bearings of stationary objects is entitled to greater weight than the opinion evidence produced by plaintiff. The San Simeon, 1 F.Supp. 506, 508 (S.D.N.Y. 1932), aff'd 63 F.2d 798 (2d Cir. 1933); Cornec v. Baltimore & O. R. Co., 48 F.2d 497, 500 (4th Cir. 1931).

The testimony of Mr. Dana, an expert witness called by plaintiff, consisted of inferences based upon inferences, that commenced with the inference that the location of the collision was that as arrived at by Mr. Doran. In rejecting this kind of testimony by experts, the Court, in Lowery v. The Ellen S. Bouchad, 128 F.Supp. 16, 21 (N.D.N.Y. 1955), aff'd per curiam 229 F.2d 436 (2d Cir. 1956), appropriately stated:

> It is probably good guessing but not good proof; it comes from inference based upon inference, presumption based upon presumption. (Citations omitted)

In view of the foregoing findings of fact and conclusions of law, plaintiff's cause of action is dismissed, with costs to the defendant.