Joseph David LINEHAN, Jr., and Joseph David Linehan, Sr., Plaintiffs,

v.

UNITED STATES LINES, INC., Defendant.

Joseph David LINEHAN, Sr., Plaintiff,

v.

Joseph David LINEHAN, Jr., and United States Lines, Inc., Defendants.

Civ. A. Nos. 74–118, 74–97.

United States District Court, D. Delaware.

June 23, 1976.

Roderick R. McKelvie, of Richards, Layton & Finger, Wilmington, Del., for plaintiff Joseph David Linehan, Jr.

Robert K. Payson, and Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, Del., for plaintiff Joseph D. Linehan, Sr.

Frank J. Miller, of Miller & Foulk, Wilmington, Del., for defendant Joseph D. Linehan, Jr.

Walter L. Pepperman, II, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant United States Lines, Inc.; John T. Biezup, of Rawle & Henderson, Philadelphia, Pa., of counsel.

## OPINION

·CALEB M. WRIGHT, Senior District Judge.

This suit arises from injuries sustained in the collision of the Yacht Lotus ("Lotus") and the S.S. American Legend ("Legend"), a steam vessel owned and operated by the United States Lines, Inc. ("U.S. Lines"). Actions were filed by the owner of the sailing yacht, Dr. Joseph David Linehan, Jr., ("Dr. Linehan"), and his father Captain Joseph David Linehan, Sr. ("Capt. Linehan"), against U.S. Lines, and by Capt. Linehan against his son and U.S. Lines. U.S. Lines answered and cross-claimed against Dr. Linehan. The actions were consolidated and tried together, to the Court sitting in admiralty. The Court makes the following findings of fact and conclusions of law.

### A. Findings of Fact

1. The collision occurred on the morning of June 14, 1972, at approximately 4:30

682

A.M.,[1] in the ship channel in the Delaware River, near that point where the Deepwater Range and Bulkhead Bar Range intersect, or to the west of a line drawn between Bouy 2D and 4B.[2]

2. The Lotus was at that time proceeding on a voyage from City Island, New York, where she had been purchased by Dr. Linehan, to Annapolis, Maryland, where she would be docked. (Tr. 612; PX–62, p. 6).[3] The Lotus is a yawl rig sailing vessel, 35 feet long, with a draft of five feet, nine inches. She carries a gasoline powered auxiliary engine. (Tr. 612; PX–62 at 6–7).

3. The Legend is a container ship, 661 feet long, drawing 27 feet (25 feet forward, 28 feet aft) loaded as she was during this voyage. She was proceeding on a voyage from Philadelphia, with a cargo of containers, bound for Savannah, Georgia. She is powered by a steam engine driving a single screw. (PX–62 at 4).

4. Deepwater Point Range is a channel some 3.76 miles long and 800 feet wide. (PX–1). The Bulkhead Bar Range is .56 miles long, and 1600 feet wide. (Id.). At the intersection of the two ranges, the River makes a bend to the southeast, which terminates in the intersection of the Bulkhead Bar Range and the New Castle Range. The water depths shown on the chart (PX–1) indicate that the channel is deep enough for the operation of the Legend, but that outside the channel the water shoals quickly, and the Legend could not operate without grounding. The water just outside the channel is deep enough for the operations of the Lotus, but shoals so quickly that the Lotus could not venture far outside the channel without risking running aground.

5. During the voyage in question, the master of the Lotus was her owner, Dr. Linehan. (Tr. 43, 613–14).

6. Capt. Linehan had provisioned the Lotus, and agreed to sail on her to assist his son in the navigation of the craft, and in other ways. (DX–11 at 6, 8; Tr. 43). Capt. Linehan by his experience of some thirty years in the Navy, approximately half of which was served as a deck officer at sea, was qualified to navigate the vessel. (Tr. 29–30).

7. The Lotus had left City Island, New York, several days prior to the events at issue, and had come through the Cape May Canal near the tip of New Jersey, and entered the Delaware Bay on the evening of June 13, 1972, at approximately 5:00 o'clock. (Tr. 44–45, 614).

8. On the evening of June 13, 1972, the master of the Lotus determined that the yacht would not stop that night, but rather would continue up the Delaware Bay and River to the entrance of the Chesapeake and Delaware Canal, proceed through the canal to the Chesapeake Bay and thence to Annapolis. (Tr. 45–47, 614, 936).

9. From the evening of June 13th until the early morning hours of June 14th, Capt. Linehan and Dr. David Matthews, a personal friend of Dr. Linehan who had agreed to accompany the Lotus on her voyage and who was an experienced sailor, stood the watch. The Lotus proceeded upriver, under power, staying to the outside of the Channel on her own starboard side, i. e., the east side of the river. (Tr. 46, 939–40).

10. As the Lotus proceeded upriver, she showed the following navigation lights: red and green running lights; a white stern

---

1. The exact time of collision is impossible to determine. Testimony indicates, however, that the collision occurred while the Legend was in a hard right turn. A course recorder tape, PX–10, which logs the time and course of the vessel, indicates the turn occurred at 4:32 A.M., E.D.T., and continued for approximately 120 seconds. The clock included in the recorder is accurate to within ± 1 minute. Witnesses on board the vessels place the accident as occurring somewhere between 4:20 A.M. and 4:40 A.M. (See Tr. 284, 291–92, and 788–89, 815–

16). This Court need not find an exact time, since there is no dispute as to actions taken by the vessels.

2. A section of C & G S Chart # 294 showing the area described, taken from PX–1 is attached to this Opinion as Appendix A.

3. PX–62 is that portion of the pre-trial order setting forth the stipulations of the parties as to certain facts not in issue before the Court.

light visible for 360°; and a white masthead light, also visible for 360°. (Tr. 51, 935, 618–19). These lights were powered by batteries which were recharged from the running engine. (Tr. 676–77, 707). The lights were turned on and checked by Dr. Linehan and Dr. Matthews. (Tr. 649, 935).

11. At some time after midnight, June 14th, the Lotus, being piloted by Capt. Linehan, passed the entrance to the Chesapeake and Delaware Canal. Rather than entering the Canal, the Lotus continued bound upriver. (Tr. 49–54).

12. After rounding the end at the Bulkhead Bar Range, and sighting the Delaware Memorial Bridge some four miles ahead of them, Capt. Linehan and the others aboard the Lotus realized that they had passed the entrance to the Canal. Capt. Linehan had been fairly certain of the fact as he had neared Pea Patch Island and had read the buoy numbers. (Tr. 51, 939).

13. The Lotus continued upriver to the vicinity of Pennsville. (Tr. 51,616, 940).

14. At about the time that the Lotus was passing through the Bulkhead Bar Range on her way upriver, Dr. Linehan awoke and came on deck. (Tr. 615, 51–52, 940). As he was made aware of the problem of having passed the entrance to the Canal, the auxiliary engine, under whose power the vessel had been proceeding for some time, died. (Tr. 941, 55, 617).

15. One effort was made to restart the engine; the starter would not turn the engine over and rather than deplete the battery, Dr. Linehan decided not to continue to attempt to restart the engine. (Tr. 617, 675–76, 711–12). Those on board the Lotus were concerned because it appeared that the bilge pump, powered by the same electrical battery which powered the starter and the lights, etc. was not operating. (Tr. 941). Dr. Linehan also noticed that the ammeter readings indicated that the battery was not being charged from the engine. (Tr. 618).

16. After examining the chart and the shoreline, an attempt was made under sail to approach what was believed to be a dock on the Pennsville (east) side of the River, near the area marked "Riverview Beach". After approaching it, the Lotus' crew decided that no help could be obtained there. (Tr. 51–54, 195–96, 620).

17. Capt. Linehan recommended to his son that they anchor for the night outside the Channel, and in the morning attempt to repair the engine or seek assistance to do so. Capt. Linehan went forward and broke out the anchor so it could be used. (Tr. 54–55, 620–21, 942).

18. Dr. Linehan decided not to anchor but to proceed under sail back down the River to the entrance to the Chesapeake and Delaware Canal. He hoped to find a marina there which would assist in the repairs of the engine, if any were necessary.[4] Dr. Linehan hoped to reach the mouth of the Canal before morning and to anchor off of it until daylight. (Tr. 195, 620–21, 942–43).

19. At some time between 1:30 and 2:00 A.M., on June 14th, the Lotus proceeded downriver under sail. Capt. Linehan and Dr. Matthews went off watch, and Dr. Linehan and David Berry (another friend of Dr. Linehan's) took the watch. (Tr. 56, 621, 943). The wind was light, running about 4 or 5 knots, from the south backing to the southeast. (Tr. 622–23). The tide was ebbing at approximately 1½ knots. (Tr. 244). Visibility was good, about 3 miles, though the night had been overcast and somewhat drizzily earlier. (Tr. 275, 745, 727; PX–64). The Lotus proceeded on her downriver course by tacking back and forth across the Channel, heading approximately 210° true on the port tack (heading west), and approximately 110° true on the starboard tack (heading east). Her speed was approximately three knots. (Tr. 622–24, 625).

20. The Legend had loaded her cargo, and cleared Philadelphia at approximately

---

4. The Court notes that no marina or docking facilities are shown on the Chart (PX–1) near the Chesapeake and Delaware Canal, except

for those maintained at Delaware City by the Getty Oil Company.

midnight on June 14, 1972, in order to run with the ebb tide. In addition to her own crew, she carried a Delaware Bay and River Pilot, Derrick MacInnis, to assist in her navigation down the Channel. At approximately 4:17 A.M., the Legend passed under the Delaware Memorial Bridge and proceeded south into the Deepwater Gap Range.[5] (PX–62 at 4).

21. The Captain of the Legend had retired to his cabin, leaving orders to be awakened and called to the bridge in the event of trouble. On the bridge were the Second Officer, a helmsman, and the pilot. A lookout was stationed in the bow, with telephonic communication to the bridge. (Tr. 744–47, 816–17, 305; PX–41 at 4–7).

22. As she proceeded downriver, the Legend was contacted by the upbound freighter Concordia Lago ("Lago"). On board the Lago was a Delaware Bay and River Pilot, J. A. Ellis, who radioed MacInnis in order to arrange passing signals between the two vessels as they proceeded through the Deepwater Point Range. (Tr. 237–38, 242–43, 313).

23. After arranging for a red-to-red passage of the vessels, Ellis told MacInnis that as the Lago had proceeded upriver he had sighted a sailboat which had passed across the bow of the Lago, and that the sailboat's last known position was "about sixty feet off Buoy 1D". (Tr. 243, 313).

24. At the time that the sailboat had passed his bow, Ellis had not seen any running lights on her. He had seen a light flashed on the sails for some seconds, and from that flash determined her bearing and that the boat was under sail. After the Lago had passed under the stern of the sailboat, Ellis had gone to the wing of the bridge, and looked astern with his binoculars. He did not sight the sailboat or her lights. (Tr. 239–40, 246–47, 262).

25. Having acknowledged the messages from the Lago and completed the passing,

the Legend proceeded downriver. At this time she was operating at full throttle maneuvering speed which gave her 15 knots through the water, or combined with the ebb tide, about 16½ knots over the ground. No action was taken by the Legend to slow her speed following the message concerning the sailboat. (PX–7; Tr. 319, 829; PX–62 at 5).

26. The pilot and the Second Officer both searched the river ahead for the sailboat, by binoculars and by radar. The sailboat was not sighted 60 feet off Buoy 1D. The lookout in the bow of the Legend had also been notified to search for the sailboat. He had not reported a sighting. (Tr. 318, 818, 829–31; PX–64).

27. At this time, the Legend neared the end of the Deepwater Point Range, and began a left turn into the Bulkhead Bar Range. Pilot MacInnis testified and the Court finds that the Legend began its turn from approximately abeam of Buoy 2D, or slightly earlier than usual. (Tr. 320). The Legend swung from a heading of 222° to one of 195° over the course of approximately two minutes. (PX–10).

28. At the time the Legend began its turn into the Bulkhead Bar Range, the sailboat described in the message of the Lago had not been sighted. (Tr. 320–21, 326–27). The Court finds that the Legend began her turn earlier and swung to such a heading that she made the turn moving into her own port side (the east side) of the Channel, which would have put her well to the east of any boat 60 feet off Buoy 1D. (Tr. 326–27; PX–1).

29. As the Legend swung from the Deepwater Point Range into the Bulkhead Bar Range, the sailboat was sighted approximately in the center of the Channel, or slightly to the east of the center. The sighting was made by the look-out and those on the bridge at approximately the same time. (Tr. 321, 819).

other clocks on board, indicate that the Legend must have passed under the Bridge at a slightly earlier time. (Tr. 812–14).

30. At the time the sailboat was sighted, no one on board the Legend sighted any running lights aboard the sailboat, but only a light flashed on the sails of the boat. (Tr. 328-29).

31. The light flashed on the sails once briefly, and then went out. The Legend continued in her swing to the left. The light flashed on the sails again, long enough for the pilot of the Legend to get her bearing. (Tr. 328-31). The sailboat was then two shiplengths or approximately 1,330 feet off the starboard bow, heading from one point or less off the bow across the bow. (Tr. 333, 820). MacInnis ordered a hard right rudder in an attempt to pass under the stern of the sailboat. (Tr. 332, 339).

32. The Legend swung from a course of 195°, to a course of 219°. The course recorder shows that there was no hesitation or steadying of the course at 195°, but that the Legend had reached the heading of 195° and then swung immediately to the right. (PX-10; Tr. 788-89, 841). No orders to blow whistle signals or reduce speed were given. (Tr. 332, 830; PX-62 at 6).

33. After the Legend went right for approximately one minute (PX-10) her pilot ordered a hard left, to avoid swinging the stern of the Legend into the yacht. (Tr. 339). The course recorder shows the Legend swung from a heading of 219° to a course of 149°, without steadying up on her course of 219°. (PX-10).

34. As the Legend made her swing back to the left, the Second Officer called the look-out, and asked what had happened to the sailboat. The look-out replied that she had been struck by the Legend. (Tr. 821).

35. When the Lotus began her downriver course by tacking across the Channel, she was showing port and starboard running lights; a masthead light visible from 360°, used to illuminate her wind indicator; and 360° white stern light. Capt. Linehan and Dr. Matthews saw the reflection from the lights when they went below. No further checks were made on the lights. (Tr. 143, 618-19, 634, 970). Because of the engine problems and the low charge on the battery, these lights were so dim as not to be visible from other vessels.[6] The Lotus also carried two hand-held battery-powered lights, approximately five inches in diameter, used to light up the sail of the boat whenever another vessel was in the area. These "flare-up" lights were operated both by Berry and by Dr. Linehan. (Tr. 635, 994).

36. As the Lotus proceeded downriver, she passed an upbound freighter, by crossing on a port tack from the east side of the Channel to the west side to stay out of the freighter's path and allow her to pass port-to-port. (Tr. 624-25, 1019).

37. Shortly thereafter, the watch on board the Lotus saw the lights of a downbound freighter: a green running light, and both the range light and masthead light. (Tr. 627, 630, 1026). The Lotus was at that time in the west side of the Channel, south of Buoy 1D, approximately at the intersection of the Bulkhead Bar Range and the Deepwater Point Range. (Tr. 627).

38. The master of the Lotus, seeing the freighter coming downriver, determined to avoid the freighter's probable course down her own starboard (west) side of the Channel. (Tr. 632-33). Rather than exiting the Channel on the west side and risking the Bulkhead shoals, he determined to come about and cross the Channel on a starboard tack, and thus allow the freighter the west

---

6. After hearing and weighing disputed testimony with regard to the lights displayed by the Lotus, the Court has accorded great weight to the testimony of Pilot J. A. Ellis who saw no lights other than a flare-up light as the Lotus crossed his bow, and saw no lights at all after she had been passed. Ellis has no direct stake in the litigation and is a competent river pilot of some years. *See The General*, 82 F. 830, 931 (D.R.I.1897). Moreover, although Dr. Linehan and others testified that the running lights were lit at the time darkness fell, there is no testimony that the lights were checked following the engine problems which resulted in the switch from power to sail. (Tr. 634-35). The Court cannot conclude that the lights were lit, or that they were lit to the intensity required by the Inland Rules so as to be visible to other vessels on the river.

side of the Channel, while holding to the east side of the Channel. (Tr. 631–33).

39. The Lotus came about and proceeded on a starboard tack, maintaining a speed of about three knots. As she did so, the watch on board the Lotus continued to see the green light of the freighter.[7] (Tr. 633–34).

40. As the Lotus proceeded on her starboard tack, she showed the flare-up light on her sail. (Tr. 635, 1029, 1032, 1034–35). Her master continued to see only the green light, decided that the freighter was proceeding down the port (east) side of the Channel. The Lotus, therefore, came about and attempted to tack back to the west side of the Channel, to avoid the freighter. Dr. Linehan blew his air horn "more than four" times and came about. (Tr. 636, 641, 643, 945; PX–41 at 14).

41. Realizing that a collision was imminent as he came about, the master of the Lotus called for all hands on deck. (Tr. 637). Capt. Linehan and Dr. Matthews both awoke, and hurried to the hatch. (Tr. 57, 945). Capt. Linehan proceeded up the hatchway, and onto the port side of the Lotus. (Tr. 58). Dr. Matthews, coming behind him, remained in the hatchway, looking over the starboard side of the boat. (Tr. 945).

42. As Dr. Matthews and Capt. Linehan reached the deck, the Lotus was proceeding west. The sail was between Capt. Linehan and the freighter, but Dr. Matthews could clearly see the bow and the bow wave of the freighter, illuminated by one of the hand-held flare-up lights. The Lotus was struck on her aft starboard quarter. (Tr. 641, 58, 59, 945–46, 642).

43. As the Lotus was struck, Capt. Linehan and David Berry were knocked overboard. Capt. Linehan's next memory is being in the water, his right arm injured. (Tr. 60, 643, 947–48). By maneuvering their vessel to gain momentum from the ebb tide, Dr. Matthews and Dr. Linehan were able to

pick up Berry and tie Capt. Linehan to the ladder alongside. (Tr. 646, 951–52). They were picked up by the Tug Theresa McAllister which was proceeding downriver on another assignment, and heard the radio call from the Legend to be on the lookout for the damaged yacht and to render assistance. (Tr. 61, 273, 275, 277, 644, 953).

44. The Theresa McAllister carried the Lotus crew to a dock in Delaware City where an ambulance was waiting, and towed the Lotus to a safe dock. From there, Capt. Linehan was taken to a hospital in Wilmington where he received treatment. (Tr. 278, 385).

45. The damage to the hull of the Lotus as a result of the collision, and her loss of charter income prior to repairs was $15,000.00. (Stipulation, Docket # 77).

46. As a result of the collision, probably from a blow struck by an unknown object, Capt. Linehan received severe injuries to his right arm. The biceps muscle was severed and the severed ends retracted toward the elbow and shoulder respectively. Similarly, the vein and artery running through that portion of the arm were severed and retracted. The skin was severely bruised, though there was no external bleeding. The medial nerve, which runs near the muscle, was injured but not severed. Capt. Linehan required emergency surgery to repair the muscle, artery and vein, and later a skin graft to repair injured surface tissue. Because of the nature of the injuries received, it was necessary to excise portions of the biceps muscle, the artery and the vein, and attach the remaining portions. The medial nerve was not severed or excised in any way, but did not fully recover from the injuries it sustained. (Tr. 385–89, 116–19, 590).

47. As a result of these injuries and their treatment, Capt. Linehan had medical bills in the amount of $5,191.60. (Tr. 69–71; PX–33).

---

7. While David Berry testified that he did at one time see both the red and green lights of the freighter as it bore down upon the Lotus, the Court finds that his testimony on this point is entitled to little weight since it appears to be a post hoc conclusion, rather than a recollection. (Tr. 1040–45).

48. When he was in the water, Capt. Linehan was conscious and felt extreme pain; thereafter he was unconscious.[8] Following his surgery, during the post-operative period, and up to the present time, he has continued to suffer pain. (Tr. 66–67). The Court finds that as a result of his injuries, Capt. Linehan is entitled to damages for past and future pain and suffering and disfigurement in the amount of $50,000.00.

49. As a result of his injuries, Capt. Linehan has a diminished ability to use his right arm. The biceps muscle was weakened by loss of some tissue, and the arm is not now and never will be as strong as the left. (Tr. 68, 118–19, 132, 591). Similarly, the medial nerve which controls certain functions of the thumb, index finger, wrist and forearm, has not fully recovered from the injuries it sustained. (Tr. 118–19). As a result, actions normally thought to be habitual require greater concentration by Capt. Linehan in order to be accomplished, and he lacks some sensory perception in those areas.[9] (Id.).

50. Prior to the collision, Capt. Linehan had contracted with United Services Life Insurance Corporation ("U.S.L.I.C.") to be a sales agent in certain areas of the country. The salesmen maintained with the company expect to earn commissions approximating $20,000.00 per year, and Capt. Linehan had such an expectation. After some three years as an agent, Capt. Linehan was terminated by USLIC for inability to make his quotas. (Tr. 71, 73, 86, 89, 90, 95, 102, 104, 501, 503, 508, 511, 514, 519).

51. Capt. Linehan had prior sales experience following his retirement from the Navy, while working for RCA and for other concerns. He had never sold life insurance prior to his contact with USLIC. (Tr. 33–42).

52. In view of the permanent injuries sustained by him, and the results of such injuries and their effects on his ability to drive and handle some types of paperwork, the Court finds Capt. Linehan to have lost income both past and future in the amount of $116,884.00. While he is unable to give his best efforts in sales tasks, it is not clear that he would, in all events, have succeeded as a life insurance salesman. Nonetheless, the testimony is clear that he will be unable to pursue certain types of fulltime work for which he was suited prior to the accident, and the injuries received in the accident have caused that inability and the corresponding reduction in Capt. Linehan's ability to find work to supplement his Navy pension.[10]

53. There is no evidence that the Legend was damaged as a result of her collision with the Lotus.

## B. Conclusions of Law

1. This Court has jurisdiction of these cases under 28 U.S.C. § 1333. A collision between two vessels in the navigable waters of the United States is clearly within the admiralty jurisdiction of the United States. U.S.Const. Art. III, § 2; Waring v. Clarke, 46 U.S. (5 How.) 441, 12 L.Ed. 226 (1847).

2. Venue rests with this Court because the collision occurred in waters resting within this District, and the in personam defendant U.S. Lines is a Delaware corporation.

3. The Delaware River and Bay is an inland water, and those vessels operating thereon are bound by the "Inland Rules", 33 U.S.C. § 154.

---

8. Capt. Linehan lost consciousness when he was put aboard the rescue tug. He was not conscious again until after surgery. (Tr. 62).

9. —For example, grasping motions including holding writing instruments, picking up coins, etc.

10. Capt. Linehan also sought damages for his inability to continue to practice his woodworking and carpentry hobbies. Capt. Linehan urges that had he been able to continue these hobbies, he would have saved $9,000.00 on the remodeling of his home. The Court finds this amount to be remote from the injury itself, and speculative in that it is not clear that if Capt. Linehan were working fulltime at any occupation, he would have been able to do the remodeling.

4. The Lotus at the time of the accident was a "sailing vessel" as defined in 33 U.S.C. § 155.

5. The Legend was a steam vessel as defined in 33 U.S.C. § 155.

6. The Legend carried and showed the proper lights for the operation of a steam vessel, including a range light, a masthead light, and port and starboard running lights. Inland Rules, Art. 2; 33 U.S.C. § 172.

7. The Lotus was equipped with lights which were not within Inland Rules, Art. 5; 33 U.S.C. § 174, in that she carried a white masthead light visible from 360°, and a white stern light visible from 360°.

8. The Lotus was equipped with such additional lights as are specified with Inland Rules, Art. 12; 33 U.S.C. § 181.

9. Since passing signals had been agreed upon by radio between the Concordia Lago and the Legend,[11] and at the time of their passage they were passing red-to-red and were not on courses which would take them to a crossing, no whistle signals were required in their passing. Inland Rules, Art. 18, Rule I; 33 U.S.C. § 203.

10. The general rule that when a steam vessel and a sailing vessel are proceeding on collision courses, it is the duty of the steam vessel to keep out of the way of the sailing vessel, as modified by the proviso that the sailing vessel shall not hamper the steam vessel's ability to navigate in a narrow channel, is applicable to this case. Inland Rules, Art. 20; 33 U.S.C. § 205.

11. The Rule that any privileged vessel must maintain her course and speed is applicable here. Inland Rules, Art. 21; 33 U.S.C. § 206.

12. The Rule that a steam vessel should slacken speed when necessary to keep out of the way of the other vessel is applicable

here. Inland Rules, Art. 23; 33 U.S.C. § 208.

13. The Rule which requires a steam vessel in a narrow channel to keep to its own starboard side of the channel is applicable here. Inland Rules, Art. 25; 33 U.S.C. § 210.

14. The "special circumstances" rule is applicable here. Inland Rules, Art. 27; 33 U.S.C. § 212.

15. The rule requiring the exercise of the ordinary care of seaman is applicable here. Inland Rules, Art. 29; 33 U.S.C. § 221.

■ 16. The rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874), requiring a vessel guilty of a statutory violation to prove that her violation "could not" have been the cause of the collision is applicable here. *See,* Gilmore & Black, The Law of Admiralty (2d ed.) at 494, § 7–5.

17. Each of the vessels in this case is guilty of a statutory violation, in that:

(a) The Lotus failed to display the proper lights.[12]

(b) The Lotus failed to keep lit to the required intensity those lights which she had.[13]

(c) The Legend failed to keep to the starboard side of a narrow channel.[14]

(d) The Legend failed to reduce her speed when approaching a sailing vessel.[15]

(e) The Legend failed to exercise good and prudent seamanship by her failure to signal her intentions and reduce her speed when her pilot and look-out were unable to sight a sailing vessel known to be present.[16]

■ 18. Under general maritime law, a member of a crew may recover damages in excess of maintenance and cure only for the unseaworthiness of his ship, and not for the

---

11. Findings of Fact 22 and 23, *supra.*

12. Findings of Fact 35, Conclusions of Law 7.

13. Findings of Fact 35.

14. Findings of Fact 27, 28. Conclusions of Law 13.

15. Findings of Fact 32. Conclusions of Law 12.

16. Findings of Fact 32. Conclusions of Law 14, 15.

negligence of her master or his fellow crewmen. *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); Gilmore & Black, The Law of Admiralty (2d ed.) at 275–277.

■ 19. A passenger or guest upon a vessel is entitled to recover for the unseaworthiness of the vessel, the negligence of her master, and the negligence of the crew which cause injury to him, and such damages are not restricted to maintenance and cure. *Id.*

■ 20. It is a question of fact whether a person aboard a boat, who assists in her navigation, but is not paid therefore, and who has assisted in the provisioning of the boat, but who has not signed articles, is a member of the crew of the vessel, or is a guest, or has other status such as joint venturer.

■ 21. Any damages, including damages for personal injury paid by one party at fault in a collision, are subject to contribution from the other party at fault in a collision. *Weyerhauser S.S. Co. v. United States,* 372 U.S. 597, 603, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204 (5th Cir. 1968).

### C. *Discussion*

This suit has produced, from a factual situation whose contours are fairly clear, some novel questions of interpretation of the Inland Rules of Navigation, and of the maritime law. There is no doubt that a collision occurred early in the morning of June 14, 1972, between the merchant ship Legend and the yacht Lotus, as the vessels were proceeding generally downriver, the Legend under steam occupying the main channel, the Lotus under sail tacking back and forth across that channel. It is also clear that as a result of the collision, Capt. Linehan, on board the yacht Lotus, was injured and required extensive medical treatment, and has been permanently handicapped, and that the Lotus was damaged and required repair before she could be sailed or chartered.

From these facts, the Court must determine whether a steam vessel proceeding in a narrow channel has a right-of-way over a sailing vessel in that channel; whether the actions taken by the vessels were within the limits of the Inland Rules and prudent seamanship; and the extent of liability of the vessels and their owners for the injuries which have occurred, especially to Capt. Linehan whatever his status as a crew member, passenger, guest, or joint venturer in the voyage of the Lotus. The Court heard testimony for five days, and received able briefing of these issues. After consideration of the testimony, and based on the facts and conclusions of law as set forth *supra,* the Court concludes for the following reasons that Capt. Linehan is entitled to damages from both Dr. Linehan and U.S. Lines. The Court also concludes that the damages of the Lotus and of Capt. Linehan should be apportioned on the basis of fault between the colliding ships and apportions that fault: the Lotus being 20% at fault, and the Legend 80%.[17]

### 1. *The Fault of the Lotus*

■ The Lotus as she proceeded downriver was at the very least displaying the wrong lights.[18] This alone is a statutory

---

17. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) changed the long-standing rule which required damages to be apportioned 50–50 when both ships were at fault. This Court concludes that the major-minor fault rule; *see, e. g., The City of New York,* 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84 (1893), and *Reliable Transfer, supra,* 421 U.S. at 406, n.12, 95 S.Ct. 1708, is of no bearing here, since damages are now apportioned on the degree of actual fault, and it is not unjust to hold a vessel liable for her own fault. The Court takes no position on the survival of the major-minor fault rule where the

damages accruing to the ship in major fault are more extensive than here. *But see, Reliable Transfer, supra,* 406–07, 95 S.Ct. 1708, implying that the rule is too "crude" for further use. With regard to apportionment, which is based on culpability, *see Pan-Alaska Fisheries, Inc. v. Marine Const. & Des. Corp.,* 402 F.Supp. 1187 (W.D.Wash.1975).

18. *See* Tr. 618–19; where the owner of the vessel, Dr. Linehan, describes the lights as a mastlight, stern light and two running lights in contravention of Art. 5 of the Inland Rules; 33 U.S.C. § 174.

fault which brings into play the rule of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). Moreover, the Court has found that at the time of the collision the Lotus had failed to display any light, or that the lights being displayed were so dim as not to be visible to other vessels. The Lotus has not borne her burden under the rule of *The Pennsylvania* to show that her failure to display lights could not have caused the accident. Although, for reasons discussed *infra,* the Legend bears the greater fault for actions she took despite her knowledge of the presence of the Lotus, this Court cannot say that if the Lotus had been displaying proper running lights, the pilot of the Legend or her look-out would not have been able to see the Lotus sooner than they did from the light flashed on the sails; and would not have been able to determine the bearing of the Lotus at an earlier time, so as to take proper action.[19]

It may well be that by the time even a properly lighted Lotus could have been sighted, given the speed and course of the Legend, the vessels would already have been in a situation which required great diligence.[20] Nonetheless, considering that the Lotus was struck on her aft starboard quarter, and that a mere few seconds or slight change in the courses could have prevented the collision, the Court is constrained to say that a factor in producing the accident was the low visibility of the Lotus, and the inability of the other vessel to project quickly the course of the Lotus across her bow. The sighting of running lights at the time the first flash on the sails was seen, or before (since it is quite possible that running lights would have been seen prior to the flare-up light), would have given the Legend and her pilot more information on the position and heading of the

Lotus. On that basis, this Court finds the Lotus to be in fault in causing the collision.[21]

■ The Court finds no other fault to have been committed by the Lotus or her crew. The Lotus was not negligent in proceeding downriver at night under sail, with a wind which required her to tack back and forth across the channel. Certainly the most prudent course would have been that recommended by Capt. Linehan, to anchor outside the channel until dawn when the sails would be more highly visible, but it is not negligent per se to proceed at other times. The law requires only reasonable prudence. *See generally,* Inland Rules, Art. 29; 33 U.S.C. § 221.

■ Nor were the Lotus and her crew negligent in the course and heading taken prior to the collision. At the time the Lotus sighted the Legend, the Lotus was in her own starboard or the west side of the channel. Realizing that a large steam vessel proceeding downriver would need the room which the channel gave, Dr. Linehan determined to set a course which would take him out of the path which a pilot ought to take down the starboard side of the narrow channel. The chart had told Dr. Linehan that the depth outside the channel dropped rather quickly at that location to only two feet. To have come about and headed upriver in that narrow strip would have placed his sail between him and the one buoy[22] he might need to sight in order to stay within the area where the water was deep enough for his vessel. He was not required to take such a course and risk the grounding of his vessel when the east side of the channel was clear of approaching ships, and he had sufficient wind to carry him across the midline of the channel before the Legend would

---

19. *Reliable Transfer, supra,* 421 U.S. at 405–06, 95 S.Ct. 1708, notes the harshness of the rule of *The Pennsylvania,* but does so in the context of requiring a ship to pay half the damages. Since the Court now apportions damages by actual fault, the harshness has been mitigated.

20. *See,* Tr. 916.

21. *See, e. g., The Virginia,* 217 F. 604 (W.D. Wash.1914), *aff'd.,* 235 F. 98 (9th Cir. 1916); *The I. C. Harris,* 29 F. 926 (C.C.E.D.Tex.1886); *The Narrangansett,* 11 F. 918 (C.C.D.Conn. 1881).

22. The buoy was "Fl.G. 4 sec C", which marked one side of the shoal.

be upon him. The starboard tack taken at that time was, in the opinion of the Court, a proper and prudent one.

▮ Nor can any fault be found in the decision of Dr. Linehan to come about once more, as the ships were *in extremis.* Proceeding across the river from west to east on a starboard tack, he watched for the lights of the freighter to shift from green to red and green and finally to red alone, showing him that he was finally past the course of the freighter. Instead, as discussed *infra,* the freighter swung into the eastern side of the channel, and continued to show her green light to the Lotus. When Dr. Linehan realized that his course would take him into the oncoming freighter, he sounded his air horn to warn of the impending collision, and came about assuming that the Legend would stay on her course. The Legend came to her own right at about the same time, however, putting the ships into a collision course, and the collision occurred. The reactions of the master when his vessel is *in extremis* must not be judged by the harsh standard of hindsight. Rather, the Court must seek to determine whether the action was reasonable in light of what the master knew at the time he took the course. *See, The Marguerite,* 87 F. 953, 955 (D.Mass.1898). The Court is convinced here that the change *in extremis* from a starboard tack to a port tack was reasonable under the conditions as they existed, and cannot find fault with the actions of Dr. Linehan in acting as he did.

### 2. *The Faults of the Legend*

The Legend has raised several theories to justify her actions and the Court has considered them all, as contradictory as they might be. *The Court finds that the Legend was at fault for her failure to abide by the rules of the road.*

▮ The first theory raised by the Legend is that under Art. 20 of the Inland Rules, 33 U.S.C. § 205, she was the "privileged vessel", and the Lotus was under an obligation to avoid her.[23] Assuming *arguendo* that the Legend is correct in her interpretation of the Rule, she violated the first obligation of a privileged vessel: to maintain her course. Art. 21; 33 U.S.C. § 206. As she proceeded downriver, whatever the thought of her pilot on her "privileged status", she did not maintain the starboard side of the channel where she must stay as privileged vessel. Rather, she crossed into the port side of the channel without a signal. The Lotus was, as noted *supra,* attempting to leave the starboard channel in order to make room for the Legend. Had the Legend maintained her course as required by the privileged vessel rule, the collision would not have occurred.

▮ This Court, however, is not convinced that the meaning of Art. 20, as amended, is to make the sailing vessel the burdened vessel. The legislative history is not clear,[24] and the one case discussing the change recites the rule in dicta in circumstances where the sailing vessel was clearly at fault.[25] A careful reading of the legisla-

**23.** Art. 20 provides:

"When a steam vessel and a sailing vessel are proceeding in such directions as to involve the risk of collision, the steam vessel shall keep out of the way of the sailing vessel. This rule shall not give to a sailing vessel the right to hamper, in a narrow channel, the safe passage of a steam vessel which can navigate only inside that channel." 33 U.S.C. § 205.

**24.** *See,* 1966 U.S.Code Cong. & Adm.News p. 4130, 4131, reprinting House Report No. 2277. "The effect of the bill would be to provide a clear, positive obligation on the part of the growing number of small-craft operators to become aware of the commonsense demands of safety when operating in the areas of limited, narrow channels where larger vessels which

can maneuver only within such channels are also operated."

**25.** *See, Doran v. United States,* 304 F.Supp. 1162 (D.P.R.1969). In *Doran,* the operator of a commercial sailing vessel, which had collided with a Navy submarine, had not only altered the sailing vessel's design in violation of Coast Guard Regulations, but had failed to maintain a proper look-out. The submarine took evasive action, including the use of whistle signals, while the Mango turned into the submarine's course. As parts of the *Doran* opinion, *see* 304 F.Supp. at 1169–70, make clear, the amendment to the rule was no major change of policy but simply a codification of existing court interpretations.

tive history and the wording of the statute indicates that the intent of Congress was not to change the status of the sailing vessel as privileged, but rather to limit her right as privileged vessel to set a course which endangered other shipping in narrow channels. The change is no more than a codification of the requirements of common sense and prudential seamanship previously enforced by the courts.[26] No vessel, even before this change, had the right to insist on her status as a privileged vessel to the detriment of other shipping.[27] Particularly is this so where the relationship is that of the heavily laden freighter in a narrow channel meeting the more maneuverable and shallow-drafted sailcraft.[28] This Court, therefore, interprets Art. 20 as (1) placing the burden of avoidance upon the steam vessel, provided she may continue within the channel; and (2) limiting the sailing vessel to those courses which will not restrict the ability of the freighter to stay within the channel.[29]

 The Legend claims under these circumstances that she took the proper action;

upon hearing of a sailboat in the starboard side of the channel, she turned into the port side to avoid the sailboat. If the conditions were as limited as the Legend states, the Court would have a different decision to make. The Legend however neglects to include in her theory several other facts which significantly affect the way in which she should have responded. Upon hearing that a sailboat was in the area, as burdened vessel, the duty of the Legend was to discover the present position of the sailboat and her heading. A course change to the port side of the channel was the proper maneuver only if the heading of the sailboat was downriver in the starboard side of the channel; the Legend could then become the overtaking vessel, give the proper whistle signals, and pass to port. The Legend, however, did not know at the time of her maneuver whether the Lotus was heading upriver or down. She may in fact have been aware that the Lotus was *crossing* the river.[30] The Legend was thus a burdened vessel unaware of the heading of a privileged vessel, under whose stern she might

---

**26.** This rule, requiring the sailing vessel not to insist on her privilege when to do so would jeopardize another vessel, is of longstanding in American admiralty law. *See, e. g., The Cornelius C. Vanderbilt*, 6 Fed.Cas. 565, # 3,235 (S.D.N.Y.1848); *The I. C. Harris*, 29 F. 926 (C.C.E.D.Tex.1886); *The Marguerite*, 87 F. 953, 957 (D.Mass.1898); *The Devonian*, 110 F. 588 (D.Mass.1901).

**27.** "And more especially will all privilege to a particular tack or course or method of passing, not essential to her own safety, be withdrawn from a vessel, *when she has notice* that adhering to it will place another in jeopardy. She must then contribute to the common safety in such manner as a sound judgment on the facts and circumstances shall decide to have been necessary and proper. Accordingly, a sailing vessel on the wind, meeting or converging towards a common point with a steamer, has no right to persist on that course as a privileged one, *in such manner as to make a collision probable, or to drive the steamboat into certain danger to herself or other vessels to avoid her.*" *The Cornelius C. Vanderbilt*, 6 Fed.Cas. at 566 (emphasis added).

**28.** "[I]f the steamer's inability to keep off the course of the sailing vessel be seasonably apparent to the latter, there is no injustice in holding the latter to blame for the collision, if

she, in her turn, could have avoided it. In the case of the manifest inability of the steamer to give way, therefore, and in that case only, does she have the right of way over a sailing vessel." *The Marguerite*, 87 F. at 957. And *see, The M. W. Page*, 36 F. 329 (E.D.Mich.1888); and *The Minnie C. Taylor*, 52 F. 323 (S.D.N.Y.1892).

**29.** In so holding, the Court places particular emphasis on the language of the rule. The rule requires a steam vessel to "keep out of the way of the sailing vessel", while the sailing vessel is required only not "to hamper" the safe passage of the steam vessel. The Court finds that choice of language to be a clear sign that, as the cases cited *supra* notes 26 and 27 show, the steam vessel bears the primary burden of avoiding the sailing craft. The sailcraft must only give the steamer sufficient breadth to remain in the channel while she takes the action necessary to avoid collision. As noted *supra*, Dr. Linehan and the Lotus were well within those requirements.

**30.** During the Ellis and MacInnis conversation, it is unclear whether Ellis informed MacInnis that "she crossed my bow." See Tr. at 244–46, 404–05. The Court need not resolve this conflict because in either event, the Legend knew neither the *present* location nor the *present* heading of the Lotus. Even if the Legend could

be able to pass safely. Under those conditions, both the Inland Rules, Art. 23; 33 U.S.C. § 208, and prudent seamanship dictate that the Legend should have slowed until she could locate the Lotus, and discover her heading. The Legend did not do so.

Moreover, even had the Legend assumed that she was more maneuverable under the higher speed, and that 15 knots through the water was a safe speed,[31] as long as she was unsure of the whereabouts and course of the Lotus, the Legend was under an obligation to make her movements clear and to signal all of her intentions, and abide by the Rules of the Road until there was sufficient information to justify a change in course. That is, the Legend, while aware of the sailboat, but unsure of its location and heading, should have maintained her course in the starboard channel or signaled her intent to deviate from that course, so that other vessels on the river could be aware of her moves. At the very least, the Legend could have used a whistle signal to indicate her confusion over the heading of the Lotus. Cf., Art. 18; 33 U.S.C. § 203. None of these things were done. The Legend instead swung on the only wrong course possible, a course designed to take her around the position of a sailboat which the pilot and the look-out knew or should have known was not at that location because they failed to sight her there upon examination.[32]

On the basis of these separate violations of the Inland Rules,[33] the Legend is guilty of a statutory fault. Far from proving that her violations could not have caused the accident, the proof in this case is clear that the violations of the Legend were primarily responsible for the collision, both in setting up the course of events which led to it, and in failing to take actions to avert it. The Court finds that the Legend's violations caused 80% of the fault herein, and that she is therefore liable for 80% of the damages accruing. See Reliable Transfer, supra.

This Court, it should be clear, finds no fault on the part of the Legend or her pilot for the actions taken when the two vessels were in extremis. When the Legend finally sighted the Lotus, on a heading which was taking her across the bow of the freighter, the pilot properly ordered a hard right rudder in an effort to cut under her stern. While a whistle signal would perhaps have been the more prudent exercise of seamanship, the Legend was under no obligation to assume that the Lotus would change her heading once more. Once again, as noted above, the actions of a pilot in extremis must be weighed not by what hindsight considers the better course, but by what was a reasonable course or order at the time it was given, under the conditions as they then existed. See The Marguerite, 87 F. 953 (D.Mass.1898).

assume that the sailboat was anchored in the channel, when the pilot and look-out failed to locate the Lotus at the given last location, the pilot should have recognized that the only logical result of such a failure was that the Lotus had moved, and that he did not know where she was. MacInnis admitted as much on cross examination. Tr. 406–09; Cf., Tr. 905.

31. See, Tr. 894–95, 906–07.

32. This Court is troubled by other aspects of the Legend's maneuvers. As soon as the pilot knew that a sailboat was downstream and no lights were sighted, he could not assume that the sailboat had disappeared. The Court finds nothing in the record, but believes from its own experience and knowledge, that a spotlight must have been available on the bridge and could have been shown on the water to locate the Lotus. Cf., Tr. 280. The Inland Rules, of

course, do not require it, and this Court makes no finding of fault based on the omission to do so, especially where no facts exist in the record upon which to make such a judgment. Nonetheless, the duty of a pilot to handle his ship safely must in this Court's view include the duty to make a search for a vessel known to be in front of one's own vessel. The fact that a radar search was made is not sufficient, since a wooden or fiberglass sailboat has little reflective surface, and therefore shows up on radar only when relatively close. See generally, Tr. 283.

33. The Legend failed to maintain a proper course down the starboard side of a narrow channel (Art. 25); failed to keep out of the way of a sailing vessel (Art. 20); failed to reduce speed (Art. 23); and failed to exercise prudent seamanship (Art. 29).

## C. *The Recovery of Captain Linehan*

Since the Lotus has been found partially at fault, the Court was initially concerned as to what recovery Capt. Linehan could have from his own vessel.[34] If Capt. Linehan were regarded as a "seaman" or the "member of a crew" of the vessel, he might well be within the general admiralty rule which limited recovery of seamen to maintenance and cure, unless the unseaworthiness of the vessel be proven.[35] There is no recovery merely for the negligence of a seaman's fellow servants.[36] On the other hand, if he were a passenger, there would be no such limitation. Moreover, Capt. Linehan might have been considered a joint venturer.[37] Under a series of cases relating to pleasure boaters,[38] the recovery due joint venturers is even more confused.[39]

Had the Legend not been at fault, the Court would have been required to make a determination of whether Capt. Linehan would be limited to the recovery of maintenance and cure or if he would instead be entitled to a fuller recovery based either on theories of unseaworthiness, or on a determination that the reasons underlying maintenance and cure[40] do not apply to the situation of persons injured while carrying on "crew-like" duties on board pleasure vessels. These issues need not be faced by the Court, however.

As discussed *supra*, the collision was the result of the mutual fault of the two vessels. Whatever the situation might be with regard to someone who was injured through his own negligence or while in command of one of two vessels in a "both-to-blame" collision,[41] it is clear that Capt. Linehan is in no way at fault for what occurred. Had he been in command, the Lotus would have anchored outside the channel when her motor died. During the period when the maneuvering was taking place, he was below, and bore no responsibility for the actions of the vessel.[42] The Court, therefore, finds Capt. Linehan to be an innocent third-party injured in a both-to-blame collision, whatever his relationship to the Lotus.

It is a rule of long standing in the admiralty law that an innocent party injured in a both-to-blame collision may recover in full from either party, and the parties to blame are considered as joint tort feasors, who have a right of contribution between them. *Weyerhauser S. S. Co. v. United States*, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); *and see The North Star*, 106 U.S. (16 Otto) 17 (1882), at 21, 1 S.Ct. 41, 27 L.Ed. 91, tracing the origins of this rule back to the Rules of Oleron and the Laws of Wisbury. Therefore, Capt. Linehan is entitled to recover the full amount of his damages from

---

34. The pleadings in this case were brought in Admiralty for negligence, not under the Jones Act. There was no specific allegation of unseaworthiness, although the allegation and proof of failure to display lights might have been read that way. Nor were there any requests for "maintenance and cure".

35. *See, The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), and *see generally*, Gilmore & Black, The Law of Admiralty, 276–80 (2d ed. 1974).

36. *Id.* Of course, this rule has been liberally interpreted; much of what would normally be thought of as negligence has been held in admiralty to constitute unseaworthiness. *See*, Gilmore & Black, *supra* at 383–404.

37. Capt. Linehan had provisioned the Boat. DX–11 at 8.

38. *See, Merrill Trust Co. v. Bradford*, 507 F.2d 467 (1st Cir. 1974); *Murphy v. Hutzel*, 27 F.Supp. 473 (E.D.Pa.1939); *Kanischer v. Irwin Operating Co.*, 215 F.2d 300 (5th Cir. 1954). *But see, In re Read's Petition*, 224 F.Supp. 241 (S.D.Fla.1963).

39. *See generally, Merrill Trust Co., supra.*

40. *See Harden v. Gordon*, 11 Fed.Cas. 480, No. 6047 (C.C.D.Me.1823); Gilmore & Black, *supra*, at 281 et seq.

41. *See Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir. 1968).

42. This in itself is sufficient to distinguish such cases as *Merrill Trust*, where it was unclear who was actually piloting the vessel when she was grounded.

either the Lotus and her owners, or the Legend and her owner; the two vessels and their owners in turn have a right of contribution between themselves.

■ Two further questions need be determined. It is clear that Capt. Linehan's recovery is not limited by his relationship to the Lotus. The cases make clear that the amount of contribution which the Lotus owes is similarly not limited to the amount for which she might have been liable were the fault hers alone. *See, Weyerhauser S. S. Co., supra*; and *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir. 1968). The fact that under other circumstances a liability might be limited by compensation laws or even the admiralty's limitation of liability has no application to the both-to-blame collision. *Id.*

■ The liability of the Lotus is limited, however, by the apportionment of her fault. Under the older cases, the right in contribution was set at half the damages, that being the prevailing American Admiralty Rule.

That rule was changed as discussed *supra*, note 17, by *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The Court, therefore, holds that Capt. Linehan may recover his damages from either the Lotus or the Legend, but that the Lotus shall receive contribution in the amount of 80% of the damages from the Legend and her owners, or that the Legend may recover 20% of the damages from the Lotus and her owner.[43]

The Court holds that Capt. Linehan is entitled to recover $172,075.60. The Lotus and her owner, and the Legend and her owner shall be liable for the full amount as joint tort feasors; the Lotus shall be entitled to 80% contribution and the Legend 20% contribution.

This Court also holds that the Legend and her owner shall pay to the Lotus and her owner 80% of the damages sustained by the Lotus which have been stipulated in the amount of $15,000.00.

Submit Order.

See photo on page 696.

---

**43.** The fact that each is liable in contribution makes no difference in the determination of whether execution could be had against either. Execution for the full amount of Capt. Line-han's damages runs against either and both. *See Empire Seafoods, Inc., supra*, 398 F.2d at 217. Here there is no statutory bar to the liability of the Lotus. *Id.*